**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROFESSIONAL TOWING & RECOVERY OPERATORS OF ILLINOIS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 08 c 4096 |
| CHARLES E. BOX, in his official capacity as Chairman of the Illinois Commerce Commission & Transportation Division, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Before the Court is Plaintiffs' motion for preliminary injunction [18].  For the reasons stated below, the motion is granted in part and denied in part.

**I.      Background**

In this lawsuit, Plaintiffs Professional Towing & Recovery Operators of Illinois, Wes's Service, Inc., and North Shore Towing, Inc. ("Plaintiffs") seek preliminary injunctive relief against enforcement of several provisions of the Illinois Commercial Safety Towing Law ("the State Towing Law"), codified in the Illinois Vehicle Code at 625 ILCS 5/18d-101, *et seq*. Plaintiffs contend that the challenged provisions are preempted by federal law.  They have sued Charles Box, in his official capacity as Chairman of the Illinois Commerce Commission and Transportation Division ("ICC").  Notwithstanding the State of Illinois' Eleventh Amendment immunity from suit in federal court, Chairman Box is a proper defendant in this action under *Ex Parte Young*, 209 U.S. 123, 156 (1908), which permits federal courts to enjoin state officers "who threaten or are about to commence proceedings, either of a civil or criminal nature, to

enforce against parties affected an unconstitutional act, violating the Federal Constitution." A claim that state law conflicts with, and therefore is preempted by, federal law may be maintained under *Ex parte Young* so long as Plaintiff only seeks prospective declaratory or injunctive relief, and not money damages against the State. See *Marozsan v. United States*, 852 F.2d 1469, 1494-95 (7th Cir. 1988).

A.      **The state law at issue.**

Although the State Towing Law was passed by the General Assembly and signed into law by Governor Blagojevich in 2007, it did not go into effect until July 1, 2008. On August 28, 2008, the ICC adopted final rules implementing the Act. Those rules were published at 92 Ill. Admin. Code 1715.5, *et seq.*, and took effect on September 15, 2008. The State Towing Law applies in counties with a population of more than one million people and in counties with fewer than one million people that have adopted the Commercial Relocation of Trespassing Vehicles Law (625 ILCS 5/18a; 625 ILCS 5/18d-180). At the present time, only 5 of the 102 counties in Illinois are affected: Cook, Will, Kane, DuPage, and Winnebago Counties.

The State Towing Law regulates "commercial vehicle safety relocators," which the law defines as persons or entities "engaged in the business of removing damaged or disabled vehicles from public or private property by means of towing or otherwise, and thereafter relocating and storing such vehicles." 625 ILCS 5/18d-105. Thus, the law applies to all businesses that tow and store damaged or disabled vehicles. The State Towing Law includes the following statement of "[p]ublic interest and public welfare":

> The General Assembly finds and declares that commercial vehicle towing service in the State of Illinois fundamentally affects the public interest and public welfare. It is the intent of the General Assembly, in this amendatory Act of the 95th General Assembly, to promote the public interest and the public welfare by requiring similar basic *consumer protections and fraud prevention measures* that are required of other marketplace participants, including the disclosure of material

terms and conditions of the service to consumers before consumers accept the terms and conditions. The General Assembly also intends that the provisions in this amendatory Act of the 95th General Assembly *promote safety for all persons and vehicles that travel or otherwise use the public highways of this State*. The General Assembly finds that it is in the public interest that persons whose vehicles are towed from the public highways know important basic information, such as where they can retrieve their vehicles and the cost to retrieve their vehicles, so that they can *avoid vehicle deterioration and arrange for a prompt repair of the vehicles*.

625 ILCS 5/18d-110 (emphasis added). As that statement makes clear, the General Assembly's objectives in enacting the State Towing Law included "consumer protection," "fraud prevention," and "promot[ing] safety." *Id.*

While it is unclear whether the brief transcript of the House debate attached to Plaintiffs' reply brief constitutes the entirety of the legislative history of the State Towing Law, all of the legislative history currently before the Court at least marginally reinforces some of the objectives referenced in the text of the statute – although it focuses primarily on what appear to be consumer protection concerns.[1] As Representative McCarthy stated during the House of Representatives' consideration of the bill, it was intended "to address the problem in some of the counties up in the northeast part of the state where some towers were taking advantage of a lot of the local residents." Representative McCarthy acknowledged that a prior version of the bill "would have been bothered by a federal preemption about setting rates for towers" and that the bill that ultimately was passed and enacted into law was "a complete disclosure" bill to "protect[]" citizens from "abuse[] by some of these towers who don't do it the right way." He later reiterated that "the way the Senate passed" an earlier iteration of the bill "would go against

---

[1] It is unclear whether there are any transcripts of Senate debates or any other legislative materials, such as committee hearings. No such materials have been provided in the parties' submissions to date.

a federal preemption," and that the bill presented for consideration in the House contained

"protections" for "our consumers."[2]

In Plaintiffs' second amended complaint, they challenge the following specific provisions of

the State Towing Law as preempted by federal law:

- Section 18d-115, requiring towing companies engaged in consensual towing[3] to obtain a safety relocator's registration certificate from the ICC, for which the companies must pay an annual fee of $450 and an additional fee of $150 per towing vehicle;

- Section 18d-120, requiring towing companies to obtain specific authorization prior to towing a damaged or disabled vehicle, to provide specific and detailed written disclosures to vehicle owners or operators, and to maintain copies of completed disclosures for a minimum of five years;

- Section 18d-125, requiring towing companies to issue itemized final invoices to vehicle owners or operators on demand and to retain copies of such invoices for a period of five years;

- Section 18d-130, requiring towing companies to post signs at their storage facilities advising customers of their rights;

---

[2] In addition to the transcript of the brief discussion of the State Towing Law in the Illinois House of Representatives, Plaintiffs have attached to their briefs several documents from the web site of a Chicago television station and a news release by the Governor's Office, all of which stress the consumer protection objectives of the State Towing Law.  See, *e.g.*, "New State Towing Regulations Curb Accident Chasers," Aug. 31, 2007 (http://cbs2chicago.com/investigations/towing_companies.Accident2.339571.html); News Release, Office of the Governor, "Gov. Blagojevich signs 'Truth in Towing' law for Illinois motorists," August 31, 2007 ("Governor Rod R. Blagojevich today signed legislation designed to protect Illinois motorists from excessive fees and other abuses from unlawful towing companies").  While the Court has examined those documents, because the statements reflected in them were not made by members of the General Assembly during their consideration of the legislation at issue, the Court is hesitant to give them much, if any, weight as "legislative history."  See *Metzl v. Leininger*, 57 F.3d 618, 618, 621 (7th Cir. 1995) (concluding that a proclamation by the governor discussing the purposes of a statute enacted the previous year making Good Friday a legal and school holiday throughout the state "is not definitive evidence of the statute's original purpose").

[3]  Consensual towing occurs when the vehicle operator requests that a tow truck come to the scene of an accident or the location of a disabled vehicle and the vehicle is towed with the knowledge and consent of the operator.  Non-consensual towing occurs when a vehicle is towed without the knowledge and consent of the operator or owner – for example, when a car is parked illegally, either on public or private property. In this case, Plaintiffs challenge the State Towing Law only as it applies to consensual towing.

- Section 18d-135, requiring towing companies to maintain copies of all disclosures and invoices for five years and to make such records available for inspection by the ICC and imposing penalties or fines for violations;

- Section 18d-145, requiring copies of the safety regulator's registration certificate to be carried in each tow truck;

- Section 18d-150, prohibiting towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability;

- Section 18d-155, imposing penalties and fines for failure to comply with the Towing Safety Law; and

- Section 18d-165, requiring that charges accrued by vehicle owners or operators for consensual tows to be payable by cash or major credit card.

### B. The federal law at issue.

According to Plaintiffs, the nine challenged provisions of the State Towing Law conflict with, and thus are preempted by, Section 14501(c) of the Interstate Commerce Act, as amended by the Federal Aviation Administration Authorization Act and the I.C.C. Termination Act of 1995. 49 U.S.C. § 14501(c). Section 14501(c) states, in pertinent part:

> (1) General rule. – Except as provided in paragraphs (2) and (3), a State * * * may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier * * * with respect to the transportation of property.*[4]
>
> (2) Matters not covered. – Paragraph (1) –
> (A) *shall not restrict the safety regulatory authority of a State with respect to motor vehicles*, the authority of a state to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization; * * *

---

[4] It is undisputed that "[t]ow trucks * * * are 'motor carrier[s] of property' falling within § 14501's compass." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 430 (2002).

49 U.S.C. § 14501(c) (emphasis added). Section 14501(c) thus expressly contains both a "general rule" of preemption and an exception for certain "[m]atters not covered" by that general rule.[5]

## C.    The procedural history of this case.

Plaintiffs filed this lawsuit on July 18, 2008. They contend (i) that the challenged provisions of the State Towing Law have a direct and substantial effect on the "prices, routes, and services" of towing-motor carriers engaged in consensual towing operations in violation of federal law, and (ii) that those provisions are not saved from federal preemption under the exception for state safety regulations. After the filing of the lawsuit, Defendants temporarily deferred enforcement of the new law. Subsequently, the ICC adopted its implementing regulations and commenced enforcement. Plaintiffs then brought their motion for a preliminary injunction [18]. While the briefing on that motion was in progress and following negotiations between the parties, Defendant filed the following stipulation [25]:

> In the event the Court deems any portion of the Safety Towing Law, 625 ILCS 18d/101 *et seq*., to be preempted by federal law, the Defendant, Charles E. Box, Chairman of the Illinois Commerce Commission & Transportation Division, agrees that any fines or penalties levied for violations of those preempted sections will be refunded.

While Plaintiffs thus expect to recover any "fines or penalties" levied for violations of portions of the State Towing Law that may be found to be preempted in the final analysis, Plaintiffs have acknowledged that they "are not seeking money damages" from Defendant (or, by extension, from the State) in this case. Pls. Reply Br. at 12. As a result of that clarification, and of Plaintiffs' decision to bring this action against Chairman Box in his official capacity, there

---

[5] The other exceptions to preemption in Sections 14501(c)(2)(C) and (c)(5) apply to non-consensual towing, and thus are not at issue here.

appears to be no Eleventh Amendment bar to any of Plaintiffs' requested relief, nor has Defendant suggested any such bar.

Before turning to the legal analysis, the Court notes the limited record on which the motion for preliminary injunction has been presented for decision. In support of their motion, Plaintiffs have provided affidavits of two individuals who are involved in the towing business. Both affiants, William Howard and Brian Booker, relate information concerning the enforcement by the ICC of certain provisions of the State Towing Law. Mr. Booker also avers that complying with the State Towing Law will require towing operators to spend additional time on the sides of busy roadways and will cause operators to interact more with members of the public while performing the additional services required under the Law. At the September 18 hearing on the presentation of the motion, counsel for Defendant indicated that Defendant might wish to put in evidence – either in the form of affidavits or live witnesses – in opposition to Plaintiffs' motion and in support of Defendant's contention that the new law advances safety concerns. However, at the next status on October 8, counsel for Defendant advised the Court that Defendant would not be presenting affidavits or other evidence in connection with the briefing on the motion for preliminary injunction, but anticipated submitting evidence, including affidavits, at the summary judgment stage.

As a consequence of the limited record, the Court's rulings necessarily are more tentative than they might be on a more robust record. For example, a more developed record may shed light on the extent to which provisions of the State Towing Law impact the "prices, routes, and services" of towing companies – and whether any such impact is significant or merely incidental or remote. In a similar vein, further factual inquiry may illuminate the extent to which the various provisions of the state law are genuinely responsive to legitimate safety concerns. It also

bears mentioning that, as Plaintiffs have recognized (Pls. Reply Br. at 12 n.4), the stipulation pursuant to which Defendants have agreed to refund any fines or penalties imposed under any provision that is found to be preempted has significantly altered the irreparable harm calculus that the Court must undertake in deciding whether to grant the preliminary injunctive relief that Plaintiffs have requested. Compare Pls. Opening Br. at 12 with Pls. Reply Br. at 12 & n.4.

To be sure, the abbreviated record and the corresponding risk that the Court's opinion may rest on a less than complete understanding of the issues in the case are by no means unusual or unique to this case. As the Eleventh Circuit recently explained, "[w]hile there may be clear cut cases where preemption questions can be resolved on the pleadings, * * * it is far more common to resolve issues like the ones here at summary judgment with the benefit of a complete understanding of the impact of the regulations." *Taylor v. Alabama*, 275 Fed. Appx. 836, 842, 2008 WL 1868083, at *5 (11th Cir. Apr. 29, 2008).

## II.  Analysis

### A.  Preliminary injunction standard

Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In the Seventh Circuit, a court must consider the following factors in deciding whether to grant a preliminary injunction: (i) the prospect of some likelihood of success on the merits of the claim; (ii) the presence of irreparable harm to the moving party, (iii) the absence of an adequate remedy at law; (iv) the balance of the harms between the parties, and (v) the public interest. See, *e.g.*, *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386-88 (7th Cir. 1984). The first two factors must be considered at the threshold, for when the moving party has no chance of success on the merits or

cannot make any showing of irreparable harm, a motion for preliminary injunction ordinarily will be denied on that ground alone. See *Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 463 (7th Cir. 2001); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). Under the "sliding scale" approach employed in this circuit, "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." See, *e.g.*, *Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001). "The sliding scale approach is not mathematical in nature; rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id*. at 895-96.

### B.     Federal preemption law

Plaintiffs' likelihood of success on the merits of this litigation turns on questions of preemption law. As discussed below, the basic principles of preemption law are both relatively straightforward and well-established. However, the application of those principles to the specific federal and state laws in question, on the incomplete record before the Court, and with the overlay of the preliminary injunction standard, raises more challenging issues for the Court's consideration and resolution. Moreover, because of the current posture of the case, the Court's preliminary assessment of the *likelihood* of success on the merits necessarily is tentative and subject to revision based on additional evidence or argument at summary judgment.

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). When

considering preemption, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, the "purpose of Congress" is the ultimate touchstone of preemption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

The federal statute at the center of the current dispute has its genesis in the Airline Deregulation Act of 1978 ("ADA"). Congress enacted the ADA to foster "maximum reliance on competitive market forces" by prohibiting states from enacting or enforcing any law "relating to rates, routes or services from any air carrier." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). When Congress decided to preempt state trucking regulation, it borrowed the language of the ADA, simply substituting "motor carrier" in place of "air carrier." Pursuant to the specific provision at issue in this case, a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier * * * with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

Because Section 14501(c)(1) expressly preempts contrary state law, "the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). And because the scope of federal preemption under Section 14501(c)(1) is set out with some specificity, to the extent that a state law is *not* "related to" a "price, route, or service" of motor carriers, it is not preempted. See *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992) ("enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted"). In addition, the federal law

specifically states that it "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." 49 U.S.C. § 14501(c)(2).

The Supreme Court has construed the language of the federal statute on three occasions. Although *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), involved the preemption provision in the ADA, the interpretation set forth in *Morales* is equally controlling and instructive here. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates as a general matter, the intent to incorporate its judicial interpretations as well"). In *Morales*, the Court determined Congress' use of the phrase "relating to" expressed "a broad pre-emptive purpose" and thus prohibited "[s]tate enforcement actions having a connection with, or reference to" the "rates, routes, or services" of carriers. 504 U.S. at 384. The Court further held that preemption may occur whether the state regulation at issue is direct or indirect. *Id*. at 386. Preemption will occur at least where state laws have a "significant impact" on the achievement of Congress' deregulatory and preemption-related objectives, but may not be found where state laws affect federal goals in only a "tenuous, remote, or peripheral * * * manner." *Id*. at 390. And finally, in view of the principles that it articulated, the Court held that state consumer fraud statutes could not be enforced to block deceptive air fare advertisements. *Id*. at 390-91.

In *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424 (2002), the Supreme Court construed Section 14501(c) in the context of deciding whether the state's preserved "safety regulatory authority" may be delegated to municipalities, thereby allowing local governments to pass laws relating to tow-truck operations. The Court answered that question in the affirmative, and in so doing provided additional guidance on the meaning of the

safety exception. The Court initially observed that "[i]t is the expressed intent of § 14501(c)(2)(A) that the preemption rule of § 14501(c)(1) 'not restrict' the *existing* 'safety regulatory authority of a State.'" *City of Columbus*, 536 U.S. at 438. The Court added that "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property * * * 'not restrict' the preexisting and traditional state police power over safety." *Id*. at 439. The Court further explained how to reconcile the deregulatory purpose of the Act as a whole with the preservation of state safety regulatory authority. According to the Court, "declarations of deregulatory purpose * * * do not justify interpreting through a deregulatory prism 'aspects of the State regulatory process' that Congress determined should *not* be preempted." *Id*. at 440. That construction reflects the Court's view that "[a] congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of the exception." *Id*. Nevertheless, while rejecting the "narrowest possible construction," the Court made clear that "[l]ocal regulation of prices, routes, or services of tow trucks that is not *genuinely responsive to safety concerns* garners no exemption from § 14501(c)(1)'s preemption rule." *Id*. at 442 (emphasis added).

Most recently, in *Rowe v. New Hampshire Motor Transport Association*, 128 S. Ct. 989 (2008), the defendants argued that Section 14501(c) preempted two provisions of a Maine tobacco law that regulated the delivery of tobacco to customers in the state. The challenged provisions specifically required tobacco shippers to utilize a delivery service that verified the buyer's legal age and imposed on carriers constructive knowledge that packages originating from certain senders contained tobacco products, thereby requiring the carriers to check each shipment against the list of proscribed shippers. *Id*. at 993-94. Those legislative mandates, the Supreme

Court observed, would "require carriers to offer a system of services that the market does not

now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue

in the future." *Id*. at 995. The Court therefore had no difficulty concluding that both provisions

were preempted as improper state interference with competitive market forces. *Id*. at 997-98. In

attempting to overcome preemption, the state did not invoke its "safety regulatory authority," but

instead argued for a "public health exception." *Id*. at 996. The Court declined to recognize such

an exception and found the state laws preempted because they "require motor carrier operators to

perform certain services, thereby limiting their ability to provide incompatible alternative

services; and they do so simply because the State seeks to enlist the motor carrier operators as

allies" in its efforts to enforce its tobacco laws. *Id*. at 998.[6]

### C. Framework for application of preemption principles to the laws at issue

#### 1. Does the challenged state law provision fall within the scope of the federal preemption?

Consistent with the trilogy of Supreme Court decisions discussed above, the Court will

follow a two-step approach in its examination of each of the challenged provisions of the State

Towing Law. In the initial step, the Court must decide whether the challenged provision lies

within the scope of federal preemption – that is, does the provision have a connection with a

price, route, or service of any motor carrier with respect to the transportation of property that is

more than "tenuous, remote, or peripheral?" In undertaking that threshold inquiry, the Court is

---

[6] The Court respectfully disagrees with Plaintiffs' suggestion (see Pls. Reply Br. at 3) that *Rowe* stands for the proposition that "when state law is not general," it necessarily has a "significant," not a "tenuous, remote, or peripheral" impact on a motor carrier. While in *Rowe* the Supreme Court used a "general" law that affected truckers solely in their capacity as members of the public as an example of a law that might not be preempted, in concluding that the Maine law at issue was preempted, the Court considered separately both whether the state law was "general" and whether the law had a "significant" impact on rates, routes, or services and whether the "connection with trucking" was "tenuous, remote, or peripheral." *Rowe*, 128 S. Ct. at 997-98. This Court therefore reads *Rowe* as requiring a separate inquiry into the impact of the state law, even if the law is not "general."

guided by the Seventh Circuit's teaching that a state law "relates to" rates, routes, or services "either by expressly referring to them or by having a significant economic effect upon them." *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996). Because Defendants do not contend that any of the challenged state provisions relates to the routes that towing companies serve, the specific question in each instance will be whether the state law "relates to" prices or services, whether directly or indirectly.

This Court also must bear in mind that the Seventh Circuit has broadly defined "services" to "include all elements of the [motor] carrier service bargain." *Travel All Over*, 73 F.3d at 1434; see also *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995) (holding that "services" include both matters that are both essential and non-essential to the carrier's operations). And other courts persuasively have read *Rowe* as standing for the proposition that if the "*effect* of the regulation would be that carriers would have to offer different services than what the market would otherwise dictate, the law ha[s] a sufficient effect on carrier services for preemption to apply." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2008 WL 4294282, at *4 (C.D. Cal. Sept. 9, 2008). Similarly, even if a state law or regulation does not have a direct impact on prices, in that it does not expressly set or limit prices, the law or regulation may have a substantial indirect effect on prices to the extent that it can be shown to impose significant additional costs on towing companies that they, in turn, may pass on to their customers.

## 2. Is the state provision nevertheless saved because it is genuinely responsive to safety concerns?

If the Court concludes that a provision of the state law falls within the ambit of the federal preemption because it affects rates or services in a non-trivial manner, the Court then must proceed to the second step of the analysis and consider whether the state law nevertheless is saved from preemption because it lies within the safety exception in Section 14501(c)(2). While

the Supreme Court observed that "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property * * * 'not restrict' the preexisting and traditional state police power over safety" (*City of Columbus*, 536 U.S. at 439), the Court did not have occasion in that case to apply the guidance that it gave lower courts to ensure that "[l]ocal regulation of prices, routes, or services of tow trucks" must be "genuinely responsive to safety concerns" to avoid preemption (*id*. at 442). Even today "[t]here is little case law interpreting the limits of the safety exception on federal preemption" (*Tillison v. City of San Diego*, 406 F.3d 1126, 1129 (9th Cir. 2005)), particularly in the context of state laws governing consensual towing operations. It is clear, however, that at a minimum, the Court must be convinced that the state law is not simply a means of "accomplishing some economic regulation, or more precisely consumer protection, while making findings about safety in the preambles of their ordinances." *VRC LLC v. City of Dallas*, 460 F.3d 607, 615 (5th Cir. 2006). At the same time, the exception appears to encompass "safety concerns beyond pure motor vehicle operation safety," and state laws may avoid preemption even if they were not enacted "for the exclusive purpose of promoting safety." *Am. Trucking Ass'ns*, 2008 WL 4294282, at *11-*12.

Here, the second step of the analysis is complicated because both the text and the legislative history of the State Towing Law indicate that the General Assembly had both economic and safety regulation in mind when it passed the State Towing Law. As the Fifth Circuit accurately has observed, "safety and consumer protection are not mutually exclusive categories." *VRC LLC*, 460 F.3d at 615. Yet each challenged provision must be considered under the applicable standards. The difficulty comes in sorting out, on the record currently before the Court, whether those specific provisions are likely candidates for preemption because they engage in forbidden economic regulation or are likely to pass muster because they are

"genuinely responsive to safety concerns." Finally, once the Court determines the likelihood of success on the merits of the parties' respective preemption and anti-preemption arguments, it must then apply the other preliminary injunction factors to determine what relief, if any, it may award on an interim basis, pending further development of the record and a final merits ruling at summary judgment or trial.

### D.  Analysis of each challenged provision of the State Towing Law

#### 1.  Section 18d-115

It is not entirely clear whether Plaintiffs challenge Section 18d-115 of the State Towing Law, which requires towing companies to obtain a registration certificate and pay an annual fee of $450 and additional fees of $150 per towing vehicle. Although Plaintiffs list Section 18d-115 among the provisions that they seek to invalidate, at various times during the brief history of this litigation, it has been suggested that Plaintiffs may be willing to comply with the registration (and insurance) requirements imposed by the new law. See, *e.g.*, Pls. Reply Br. at 12; Def. Br. at 12 n.3; 9/18/08 Tr. at 5; 10/8/08 Tr. at 10-11.

The Court need not pin down whether Plaintiffs object to the registration provision at this time, because any challenge that Plaintiffs may wish to mount to that provision cannot succeed at the preliminary injunction stage. To begin with, Plaintiffs do not have a high likelihood of success on a preemption claim, for it is not evident from the record that an obligation to register with the ICC affects the services that any towing company provides to its customers. In addition, although the fees imposed here are somewhat greater than the fees imposed by the City of Philadelphia under a similar towing ordinance, the Court is inclined to agree with the decision in *Helmrich Transp. Systems, Inc. v. City of Philadelphia*, 2004 WL 2278534, at *4 (E.D. Pa. 2004), in which the court held that a one-time $250.00 fee for a privilege license and an annual

$50.00 fee for a towing license imposed "practical impediments" that were "so low that any effect on the towing companies' prices, routes, or services can only be called 'indirect, remote, or tenuous.'"

Finally, even if Plaintiffs might be able to show on a fuller record that the fees imposed by the General Assembly have a more significant impact on prices, they cannot show irreparable harm absent a showing that those fees could lead to insolvency or otherwise pose a serious threat to the viability of Plaintiffs' businesses. See, *e.g.*, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (economic loss generally does not justify a preliminary injunction unless a damages remedy would come too late to save the plaintiff's business); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 673 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business"). Plaintiffs have made no showing that the registration fees are so onerous that they may lead to insolvency. Moreover, although the stipulation filed by Defendant covers only "fines" or "penalties," Defendant's argument (Def. Br. at 12) that "Plaintiffs have not provided any evidence that if the registration requirements in the Towing Law are determined by this Court to be preempted, the ICC would not reimburse the registration fees paid" at least leaves open the possibility of such reimbursements in the event that (i) Plaintiffs challenge the registration requirement at the summary judgment stage and (ii) the Court rules that the registration requirement is preempted. For all of these reasons, any irreparable harm to Plaintiffs is too speculative to give rise preliminary injunctive relief in light of the modest showing by Plaintiffs on their likelihood of success on the merits.

### 2. Section 18d-120[7]

#### a. Likelihood of success on the merits

In analyzing Plaintiffs' challenge to the authorization and written disclosure requirements imposed by Section 18d-120, the Court again finds the decision in *Helmrich* instructive. In that case, the court found that a similar local law attempted to "regulate * * * the way in which towing companies relate with their clients" (2004 WL 2278534, at *4), and thus fell within the scope of federal preemption. Or, put slightly differently, Section 18d-120 "require[s] carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)." *Rowe*, 128 S. Ct. at 995. However, as explained above, even if state law "relates to" the towing companies' prices or services, the law ultimately must be upheld if its effect is minimal or if it falls within the safety exception.

#### i. Specific authorization requirement – Section 18d-120(a)

On the current record, the Court fails to see how the "specific authorization" requirement can be saved either because it has a minimal effect or because it constitutes an appropriate state safety regulation. First, it seems unlikely that obtaining the authorization on the road side can be said to have an "indirect, tenuous, or remote" effect on the total package of services provided by a towing operator. In contrast to a pure disclosure requirement – which in most instances can be discharged by handing over a largely pre-printed sheet of paper – an authorization requirement suggests a need for explanation, and perhaps even some give-and-take, on the part of the towing operator in at least some, if not many, instances. While the net result may amount to a good business practice, it has the effect of imposing on towing companies a service that the market may not require and that the towing operators may prefer not to provide, and similarly limits the

---

[7] Although Plaintiffs list Section 18d-120 as a provision that they challenge in this lawsuit, the Court has been unable to discern any specific arguments targeting Sections 18d-120(d) or (e). Accordingly, in this decision at the preliminary injunction phase, the Court discusses only Sections 18d-120(a) through (c).

ability of towing companies to provide incompatible alternative services.  See *Rowe*, 128 S. Ct. at 995-98.

Second, even if the burden on the towing companies were minimal, the safety rationale does not appear likely to apply.  As noted above, Plaintiffs are challenging the state law only as it applies to consensual tows, which the Court understands to encompass only tows that have been requested by the vehicle operator (or another authorized person).  If that understanding is correct, then there is no basis (at least on the current record) for concluding that Defendants are likely to be able to show that the requirement of a second, formal authorization by the vehicle operator was motivated by safety concerns.  It seems far more likely that the legislative intent in requiring another manifestation of consent, after the mandated disclosures (including as to price) have been made, was consumer protection.  For both of these reasons, the Court concludes that Plaintiffs have shown a substantial likelihood of success on their argument that the specific authorization requirement in Section 18d-120(a) is preempted.[8]

### ii.    Disclosure requirements – Section 18d-120(b)

The written disclosure portion of Section 18d-120(b) presents a closer and more challenging question on the likelihood of success on the merits prong.  As Defendants point out, the disclosures can be provided on a pre-printed form, thus suggesting a "tenuous, remote, or peripheral" effect on the services provided by the towing operator.  In a manner of minutes, if not seconds, the operator might be able to fill in the blanks as to any information that is not already listed on the form.  Moreover, some of the information that the state law mandates – for

---

[8] The Court adds that its finding that Plaintiffs have a substantial likelihood of success on the merits of their claim that Section 18d-120(a) – or any other provision of the State Towing Law – is preempted does not prevent towing companies from obtaining specific authorization before towing a vehicle if they choose to do so as a business practice.  The fact that a particular business practice cannot be *compelled* by an act of the state legislature does not by any stretch of the imagination mean that the practice is *prohibited*.  See *Rowe*, 128 S. Ct. at 995-98.

example, the name of the towing company, the address of the location to which the vehicle will be towed, and the cost for the towing services – may well be responsive to safety concerns. Providing basic information of that nature would advance the express statutory purpose of arranging for prompt release and repair of vehicles (see 625 ILCS 5/18d-110), which many courts have found to advance a legitimate safety concern. For example, on two separate occasions, the Ninth Circuit has endorsed the notion that legislation is "safety-related" if it "expedites recovery of towed vehicles." *Tillison v. Gregoire*, 424 F.3d 1093, 1104 (9th Cir. 2005); *Tillison v. City of San Diego*, 406 F.3d 1126, 1129-30 (9th Cir. 2005). Some state courts have adopted a similar view. See, *e.g.*, *Crane Towing, Inc. v. Gorton*, 570 P.2d 428, 434 (Wash. 1989) (holding that legislation that "tends to expedite recovery of their vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public").

On the other hand, the itemized description of the vehicle owner or operator's rights under the State Towing Law seems less targeted to safety concerns and more responsive to consumer protection issues. But on this record, the Court is not in position either to determine whether the effect of the itemized description requirement is "significant" (and thus preempted) or "remote" (and thus not preempted). Nor is the Court in position to apprehend how the itemized description provisions may be said to "genuinely respond to safety concerns," because Defendants have "not yet carried [their] burden of proving that the safety exception applies" to the description provisions. *Helmrich*, 2004 WL 2278534, at *5.

### iii.    Record keeping – Section 18d-120(c)

Section 18d-120 also requires towing companies to maintain copies of all completed disclosure forms for a minimum of five years. The Court questions whether a record retention requirement can be said to affect the "services" that a towing operator provides, because it is not

self-evident how record keeping bears on "elements of the service bargain" between the vehicle owner and the towing firm. *Travel All Over*, 73 F.3d at 1434. Perhaps a fuller record will be illuminating in that respect. It also is unclear whether the record keeping obligation may have at least a substantial indirect effect on prices. On the evidence to date, the Court can only speculate on the incremental additional cost to the towing companies as a result of the record keeping aspects of the legislation. But even if the evidence were to show a non-trivial imposition on services or prices, the Court is hard pressed to imagine how a record keeping requirement of that duration relates to safety concerns. Accordingly, Plaintiffs have at least some likelihood of success on the merits of their challenge to the record keeping provision in Section 18d-120 (and the similar requirements in Sections 18d-125 and 18d-135), provided that they can establish on a fuller record that the provision has a significant effect on their services or prices.

In sum, as to Section 18d-120(b), the Court concludes that Plaintiffs have shown a substantial likelihood of success on the merits of their challenge to the requirement that towing operators provide an itemized description of the owner or operator's customer rights, some likelihood of success on their challenge to the record keeping requirement, and only a minimal likelihood of success on their challenge to the disclosure of the name, address, and telephone number of the towing company, the address of the location to which the vehicle will be towed, and the total cost of the towing company's services. Although the record is sparse, the Court finds that Defendants are likely to be able to sustain the basic disclosures (name, address, cost) as genuinely responsive to safety concerns – particularly in view of the cases cited above holding that promptly reuniting the owners of disabled vehicles with their cars may promote safety.

**b.**         **Irreparable harm/adequacy of remedy at law**

The most significant remaining question as to Section 18d-120 relates to Plaintiffs'

showing of irreparable harm, if any, from continued enforcement of the challenged provisions

pending a final disposition of this case. As noted above, the ICC's stipulation that it will refund

any fines or penalties imposed under any section of the State Towing Law that is determined to

be preempted has altered the irreparable harm calculus significantly.[9] To their credit, Plaintiffs

acknowledge the impact of the stipulation and the fact that they "are not seeking money

damages" in this case. Pls. Reply Br. at 12. Because Plaintiffs therefore cannot point to any

pecuniary harm, they assert that "the irreparable harm element is currently not at issue because it

is essentially presumed to exist in that if the 2007 State Towing Law is adjudicated to be

preempted, Defendant would not be able to enforce a preempted law." *Id*. at 12 n.4. In other

words, it is Plaintiffs' view that "because the 2007 State Towing Law violates the supremacy

clause of the Constitution, Plaintiffs will suffer irreparable harm and are entitled to injunctive

relief" at this preliminary stage of the case. *Id*. at 13.[10]

In support of that argument, Plaintiffs point to case law stating that "[t]he existence of a

continuing constitutional violation constitutes proof of an irreparable harm, and its remedy

certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir.

1978); see also *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (Williams, J., dissenting)

("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no

---

[9] Although the stipulation thus makes Plaintiffs' case for a preliminary injunction weaker, that is only because, as a result of the stipulation, Plaintiffs already have obtained some of the relief that they requested in their initial motion and supporting brief.

[10] It is important to note that Plaintiffs make essentially the same irreparable harm argument as to each of the challenged provisions. Thus, the Court's extensive analysis of irreparable harm in the context of the challenge to the provisions of Section 18d-120 significantly informs the Court's consideration of the irreparable harm element as to each of the other challenged provisions discussed below, and thus will not be repeated.

further showing of irreparable harm is necessary").  The Court respectfully concludes that the cases on which Plaintiffs rely do not support the conclusion that a likelihood of success on the merits of a preemption claim gives rise to either a *per se* rule or even a strong presumption of irreparable harm leading to the entry of a preliminary injunction in many, if not most, cases.  The Court instead agrees with the summary of the law articulated in a recent decision from the Southern District of New York:

> The irreparable harm flowing from a possible violation of the Supremacy Clause appears to be of a different nature than that which arises from an infringement of First Amendment rights. District courts in this Circuit have noted that while "a violation of constitutional rights can constitute *per se* irreparable harm, * * * *per se* irreparable harm is caused only by violations of 'personal' constitutional rights * * * to be distinguished from provisions of the Constitution that serve 'structural' purposes," like the Supremacy Clause.

*New York State Rest. Ass'n v. New York City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008).  Accord *Am. Trucking Ass'ns*, 2008 WL 4294282, at *14 (explaining that "[i]n the case of Supremacy Clause violations," the presumption of irreparable harm "is not necessarily warranted"); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 432 (N.D.N.Y. 1989) ("In the court's view, the [defendant's] asserted violation of the Supremacy Clause cannot, without more, serve as the basis for a finding of irreparable harm").[11]

On the basis of the cases cited above, the Court concludes that Plaintiffs are not entitled to a presumption of irreparable harm because the constitutional rights at stake here are not "personal" in nature.  Nevertheless, Plaintiffs may be entitled to injunctive relief if they can

---

[11] Plaintiffs' reliance on *Morales* in support of their request of injunctive relief (see Pl. Open. Br. at 12) is misplaced.  As other courts have explained, *Morales* "addressed the question of irreparable harm in the context of a permanent injunction, after the appellate court had found that the state law at issue was clearly preempted by federal law. Thus, these cases stand only for the proposition that when there is a very high likelihood of success on the merits of the preemption claim, little or no additional showing with respect to the other three factors is necessary." *New York State Rest. Ass'n*, 545 F. Supp. 2d at 368.  That approach is entirely consistent with the "sliding scale" approach applied in the Seventh Circuit.  See *Abbott Laboratories*, 971 F.2d at 12.

demonstrate the absence of an adequate remedy at law and the presence of irreparable harm in the circumstances of this case. Moreover, under the sliding scale approach, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side." *Abbott Laboratories*, 971 F.2d at 12.

On the record to date, and especially in view of the stipulation, the Court does not find that Plaintiffs have made a particularly strong showing of irreparable harm if they were obligated to continue complying with many of the provisions of the State Towing Law until a final determination can be made on the merits.[12] Yet, as to a few of the challenged provisions that appear, at least on the current record, to impose economic regulation to advance consumer protection goals without an evident connection to safety concerns, Plaintiffs' likelihood of success is sufficiently high that a compelling showing of irreparable harm is not required.

As indicated above, the specific authorization requirement imposed in Section 18d-120(a) is one such provision. In applying the remaining preliminary injunction factors to that provision, the Court notes initially that it finds instructive the analysis by Judge Tinder in *Government Supplier Consolidating Services, Inc. v. Bayh*, 734 F. Supp. 853, 863 (S.D. Ind. 1990). In that case, the court determined that the plaintiffs lacked an adequate remedy at law where (i) the relief that the plaintiffs sought was a declaratory judgment that certain provisions of a state statute are unconstitutional and an injunction against enforcement of those provisions and (ii) the plaintiffs were barred by the Eleventh Amendment from seeking money damages. *Id* at 863. The same circumstances are present here. The Court also finds that the potential danger to

---

[12] Plaintiffs suggest that they may be in jeopardy of defending baseless lawsuits under the Illinois consumer fraud statute, but there is no evidence in the record of any such lawsuit having been filed to date. Accordingly, the Court must conclude that Plaintiffs' concern remains speculative, and thus cannot support a finding of irreparable harm. See *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("speculative injuries do not justify" a preliminary injunction); *id.* at 705-06 ("plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries").

towing operators who would be required to solicit authorizations along the side of often busy and sometimes dark highways (as attested in the affidavits) provides sufficient evidence of harm to support the issuance of injunctive relief in light of Plaintiffs' strong case on the merits.[13]

## c. Balance of harm/public interest

The Court concludes that the remaining factors – the balance of harms and the public interest – "largely overlap" where, as here, Plaintiff "sues a government entity to enjoin the enforcement of a law or regulation." *New York State Rest. Ass'n*, 545 F. Supp. 2d at 368. Again, largely as a result of the stipulation, neither side can point to grave risk of harm regardless of the disposition of Plaintiffs' motion. Cf. *Am. Trucking Assn's*, 2008 WL 4294282, at *15 (noting that even in Supremacy Clause cases, "a presumption of harm is warranted in cases where there was also an actual harmful effect"). Thus, as to most of the specific provisions at issue, both the balance of harms and the public interest appear to favor the side that has the better likelihood of success on the merits, for the public has an interest in the enforcement of laws that promote safety or otherwise are valid, but does not have an interest in the enforcement of state laws that conflict with federal laws. See *Felder v. Casey*, 487 U.S. 131, 138 (1988) ("Under the Supremacy Clause of the Federal Constitution, '[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield'") (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).[14]

---

[13] However, apart from the authorization requirement in Section 18d-120(a), which may on occasion place towing operators unnecessarily in harm's way on the road side, none of the provisions of the new law appears to pose a substantial risk of danger to anyone. And the principal harm identified by Plaintiffs in their opening brief as a result – possible fines and penalties – has been alleviated by Defendant's stipulation.

[14] As with irreparable harm, the parties for the most part advanced their balance of harms and public interest arguments across the board as to all of the challenged provisions, rather than analyzing those

* * * * *

In sum, with respect to the authorization requirement in Section 18d-120(a), all of the preliminary injunction factors cut in Plaintiffs' favor.  In regard to the other challenged aspects of Section 18d-120, the Court concludes that Plaintiffs have not established a sufficiently high likelihood of success on the merits to warrant preliminary injunctive relief given the minimal showing of irreparable harm and the absence of a compelling case on the other preliminary injunction factors.

### 3.    Section 18d-125

Section 18d-125 requires towing companies to provide their customers with a detailed, "itemized final invoice" of charges upon demand and to retain copies of such invoices for five years.  As with other provisions of the State Towing Law, it "relates to" the services that a towing company must provide by "requiring carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future." *Rowe*, 128 S. Ct. at 995.  And given the detail mandated by the statute, it seems very unlikely that the invoice obligation could be deemed to have a "remote or peripheral" effect.  Nor does a requirement to provide a detailed invoice appear to have a legitimate connection to safety concerns.  In contrast to the bottom line price itself – which (as noted above) the Court could conceive of bearing on the ability of the owner or operator to retrieve and repair the damaged vehicle, which in turn could be said to relate to safety concerns – a detailed, itemized invoice advances consumer protection interests primarily, if not exclusively.

For these reasons, the Court finds that Plaintiffs have a substantial likelihood of success on the merits of their claim that the invoice requirement imposed in Section 18d-125 is

---

factors separately for each provision.  Accordingly, the Court's analysis of those factors in regard to Section 18d-120 largely applies to the other challenged provisions as well, unless specifically noted below.

preempted. The Court further concludes that, as with the authorization requirement (see pp. 24-25, *supra*), Plaintiffs lack an adequate remedy at law. All that Plaintiffs seek is an injunction, and once they provide the invoices, they will have no viable way of recovering either time or money from their customers or the ICC. To be sure, in contrast to the authorization provision, the invoice provision does not carry with it the added harm of dangers on the road side (unless the law was interpreted to permit a demand for a final, itemized invoice when the tow is arranged). Still, on balance, the Court concludes that Plaintiffs' very strong case on the merits, the absence of an adequate remedy at law, the balance of hardships, and the public interest all point in the direction of awarding preliminary injunctive relief under the sliding scale. Accordingly, Defendants will be enjoined from enforcing Section 18d-125.

### 4. Section 18d-130

Section 18d-130 of the State Towing Law requires towing companies to display at their storage facilities signs advising customers of their rights under the Law. Provided that the information on the sign is accurate – that is to say that the sign does not suggest to customers that towing companies must comply with any provisions of the State Towing Law that are determined to be preempted – the Court cannot envision any preemption problem. Even if the signs could be said to have some effect on the "services" that a towing company provides, their effect on the full bundle of the company's services would appear to be "tenuous, remote, or peripheral." Accordingly, the Court concludes that Plaintiffs have a minimal likelihood of success on the merits and are not entitled to a preliminary injunction against enforcement of Section 18d-130.

### 5.    Section 18d-135

Section 18d-135 tracks the record keeping requirements of Sections 18d-120(b) (as to disclosures) and 18d-125 (as to invoices), and imposes fines for violations of those requirements. To the extent that the obligation to provide the records in the first place is enjoined or invalidated – as is the case with respect to the final invoice requirement in Section 18d-125, obviously there can be no lawful obligation to retain such records. However, apart from that observation, the Court's analysis with respect to the record keeping requirement in Section 18d-120 applies equally to Section 18d-135. While Plaintiffs have at least some likelihood of success on the merits of their challenge to the record keeping provisions, provided that they can establish on a fuller record that the provision has a significant effect on their services or prices, they are not entitled to a preliminary injunction against enforcement of any of the record keeping requirements relating to the disclosures mandated in Section 18d-120 based on the record to date.[15]

### 6.    Section 18d-145

Section 18d-145 requires towing operators to carry a copy of the company's registration certificate in each tow truck. Even more so than the registration requirement itself, the obligation to carry a copy of the registration certificate would appear to impose such a "tenuous, remote, or peripheral" effect on the company's services that it would not be subject to preemption under Section 14501(c)(1). See *Helmrich*, 2004 WL 2278534, at *3-*4 (upholding licensing requirements, including requirement that towing operators "carry copies of their towing licenses in each of their tow trucks"). Accordingly, the Court concludes that Plaintiffs have a

---

[15] The State Towing Law does not appear to impose an obligation on towing companies to retain separate records relating to the authorization – or even to obtain in writing – the authorization mandated in Section 18d-120(a) and preliminarily enjoined today in the Court's separate injunction order.

minimal likelihood of success on the merits and are not entitled to a preliminary injunction against enforcement of Section 18d-145.

### 7.      Section 18d-150

Section 18d-150 prohibits a towing company from including in its contracts any provision that waives or limits the liability of the company, in tort, contract, or under any other cause of action that the vehicle owner or operator may have against the company. The link between waiver or limitation on liability clauses and "prices" or "rates" has been recognized by Illinois courts. See, *e.g.*, *In re Ill. Bell Switching Station Litig.*, 161 Ill. 2d 233, 252 (1994) (Miller, J., specially concurring) ("The liability exclusion found in Illinois Bell's tariff plays an important part in keeping rates low; if Bell is to bear the risk of liability for damages of the type sought here, then it will have to charge all its customers higher rates for the services it provides"). Because Section 18d-150 appears to have an effect on a towing company's prices, it likely falls within the scope of federal preemption under Section 14501(c)(1). Defendants have not suggested – nor can the Court envision – what safety concern is addressed by Section 18d-150. Of all the provisions in the State Towing Law, Section 18d-150 appears to most directly advance the General Assembly's "consumer protection" goals, but without any readily discernable safety motive.

Based on the foregoing analysis and on the current record, the Court finds that Plaintiffs have a high likelihood of success on their claim that Section 18d-150 constitutes a forbidden economic and consumer protection measure that is preempted by Section 14501(c)(1) and not saved by Section 14501(c)(2). In addition, the Court believes that Plaintiffs have the better of the argument on the absence of an adequate remedy at law and irreparable harm elements. Once Plaintiffs have lost the opportunity to solicit the waiver or liability limitation at the time that the

tow is commenced, that opportunity is gone forever, and the Court cannot conceive of any remedy against Defendant that could restore Plaintiffs' rights. Furthermore, because Plaintiffs have a strong case on the merits and Defendant has not pointed to any specific harm to the State or the public interest from the issuance of a preliminary injunction against enforcement of Section 18d-150, the Court finds that the balance of harms and the public interest likewise favor Plaintiffs' position.

In concluding that Section 18d-150 likely is preempted by federal law, this Court of course expresses no opinion on the wisdom of the legislation. Whether, as a matter of public policy, towing operators should be permitted to solicit waivers and liability limitations is not the question before the Court. This Court's sole function is to determine whether the state laws at issue in this case conflict with, and therefore are preempted by, federal law. Because Section 18d-150 appears to have an effect on the prices that towing companies charge their customers without advancing any safety concern, the Court finds that Plaintiffs are likely to prevail on their preemption challenge. And that finding, coupled with the Court's analysis of the other factors above, leads the Court to grant the requested preliminary injunctive relief as to Section 18d-150.

### 8. Section 18d-155

Section 18d-155 permits the ICC to request documentation and to investigate the business practices of towing companies to determine whether they are in compliance with the law. It also authorizes the ICC to impose penalties and fines for violations of the State Towing Law. Plaintiffs' challenge to this provision is somewhat puzzling. To the extent that one or more provisions of the State Towing Law is preempted, Plaintiffs obviously need not comply with any such provision (or provisions). But to the extent that the provisions of the State Towing Law are not preempted, those provisions – by definition – do not have any unlawful effect on the

relationship between towing operators and their customers. For these reasons, the Court fails to see how Plaintiffs can obtain any independent relief through their challenge to Section 18d-155 and thus denies preliminary injunctive relief as to that section.

### 9.    Section 18d-165

Section 18d-165 requires towing companies to accept either cash or a credit card for payment of towing charges. That requirement plainly relates to services; as with other provisions of the State Towing Law, requiring towing companies to accept a credit card compels them to offer a service that they might prefer not to offer. See *Rowe*, 128 S. Ct. at 995.[16] It therefore will be preempted unless Defendants can demonstrate that the safety exception applies.

Again, the Court's ability to fully assess the merits is limited by the underdeveloped record. All that the statute and the legislative history establish in regard to safety is that one of the General Assembly's goals in enacting the State Towing Act as a whole was to "promote safety" and that the General Assembly felt that the "public interest" is served by making information available to vehicle operators so that the may "avoid vehicle deterioration and arrange for a prompt repair of the[ir] vehicles." 625 ILCS 5/18d-110. Counsel for Defendant has indicated that Defendant may submit affidavits from motorists or other evidence at the summary judgment stage to support Defendant's contention that the credit card requirement does in fact respond to a legitimate safety concern. The Court is aware that other courts have upheld similar provisions as "rationally related to the goal of expediting recovery of vehicles" (*Berry*, 7 Cal. App. 4th at 591). As the California Court of Appeals explained,

> Permitting payment by credit cards allows owners to redeem their vehicles quickly, without the need to travel to a bank. For some vehicle owners, the averted inconvenience is even greater because they may not have cash in a bank. A credit card allows these vehicle owners to defer the towing charge and pay it in

---

[16] The credit card requirement may also affect prices, although the record is silent in that regard.

installments, thereby avoiding additional storage charges which would be incurred while they gathered sufficient cash to redeem their vehicles.

*Id.*; see also *Crane Towing*, 570 P.2d at 434. And, as noted above, at least one federal court of appeals, in turn, has deemed the goal of "expediting recovery of vehicles" to be a "safety-related" goal. See *Tillison*, 424 F.3d at 1104.

On balance, the Court finds that, on a fuller record complied at the summary judgment stage, Defendant may well prevail on his contention that the credit card requirement is an appropriate exercise of the state's "safety regulatory authority" (49 U.S.C. § 14501(c)(1)) that is "genuinely responsive to safety concerns" (*City of Columbus*, 536 U.S. at 442). But because that outcome is by no means certain, the Court must conclude that Plaintiff has some likelihood of success on the merits. Under the "sliding scale," Plaintiffs therefore must present a reasonably strong case on the remaining elements of the preliminary injunction inquiry, including irreparable harm.

Here, Plaintiffs have made clear that they "are not seeking money damages" (Pls. Reply Br. at 12), and have not attempted to create a record as to any pecuniary harm – even harm that is not recoverable from Defendant – that may result from continued enforcement of Section 18d-165 pending a final ruling on the merits. For the reasons explained above, the Court cannot presume irreparable harm on the basis of a claim of preemption – especially where, as here, the Court finds that the challenged provision stands a fair chance of being sustained under the safety exception. For similar reasons, neither the balance of harms nor the public interest favors injunctive relief as to Section 18d-165 at this time. Accordingly, the Court declines to enter a preliminary injunction enjoining enforcement of Section 18d-165 pending further development of the record and consideration on the merits at the summary judgment stage or at trial.

* * * * *

Based on the foregoing analysis, the Court grants preliminary injunctive relief to Plaintiffs and enjoins Defendant from enforcing the following provisions (or portions thereof):

- Section 18d-120(a), requiring towing companies to request specific authorization after the disclosures set forth in 18b-120(b) but prior to towing a damaged or disable vehicle;

- Section 18d-125, requiring that towing companies issue an itemized final invoice to vehicle operators or owners upon demand and to retain copies of such invoices for a period of five years;

- Section 18d-135, to the extent that it requires record keeping by towing companies of the itemized final invoices required by Section 18d-125 and imposes fines/penalties for not providing itemized final invoices upon demand; and

- Section 18d-150, prohibiting towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability.

However, the Court concludes that Plaintiffs have not shown that preliminary injunctive relief is warranted for the following provisions (or portions thereof):

- Section 18d-115, requiring towing companies engaged in consensual towing to obtain an safety relocator's registration certificate from the ICC, for which the companies must pay both an annual and a per vehicle fee;

- Section 18d-120(b)-(c), requiring the towing companies to provide specific and detailed written disclosures to vehicle owners or operators before towing a damaged or disabled vehicle and to maintain copies of completed disclosures for a minimum of five years;

- Section 18d-130, requiring towing companies to post signs at their storage facilities advising customers of their rights;

- Section 18d-135, to the extent that it requires record keeping by towing companies of disclosures and imposes fines and penalties related to the enforcement of the disclosure requirements under 18d-120(b);

- Section 18d-145, requiring copies of the safety regulator's registration certificate to be carried in each tow truck;

- Section 18d-155, imposing penalties and fines for failure to comply with the State Towing Law; and

- Section 18d-165, requiring that charges accrued by vehicle owners or operators for consensual tows to be payable by cash or major credit card.

Consistent with these rulings, the Court today enters in a separate document an order stating that from today's date until a final judgment is issued after summary judgment or a trial in this case, or further order of the Court, Defendant and other officers and agents of the ICC and other persons bound within the meaning of Federal Rule of Civil Procedure 65(d)(2) are preliminarily enjoined from enforcing, including by issuing tickets, citations, and notices of violations, (i) 625 ILCS 18d-120(a), which requires towing companies to request specific authorization after the disclosures set forth in 18b-120(b) but prior to towing a damaged or disabled vehicle; (ii) 625 ILCS 18d-125, which requires that towing companies issue an itemized final invoice to vehicle operators or owners upon demand and to retain copies of such invoices for a period of five years; (iii) 625 ILCS 18d-135, to the extent that it requires record keeping by towing companies of the itemized final invoices required by Section 18d-125 and imposes fines/penalties for not providing itemized final invoices upon demand; and (iv) Section 18d-150, which prohibits towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability. In all other respects, the motion for preliminary injunction is denied.

Finally, in regard to the matter of bond, Federal Rule of Civil Procedure 65(c) states that "[t]he court may issue a preliminary injunction * * * only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In their opening brief, Plaintiffs requested that the Court waive the bond requirement altogether, or in the alternative, require only a minimal bond. In support of that position, Plaintiffs pointed to their likelihood of success on

the merits and the reasonableness of the scope of the requested injunction. In his response brief, Defendant did not address either the bond requirement or Plaintiffs' request for no bond or a minimal bond.

The case law indicates that a "district court can require a bond of nominal amount in appropriate cases" (*Coyne-Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 391 (7th Cir. 1983)), provided that the amount of the bond adequately serves the purposes of Rule 65(c), and thus takes into account "defendant's demand for a bond to reimburse it for any injury it may improperly suffer as a result of an erroneous grant of the preliminary injunction." *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980).

The Court views Defendant's silence on the matter of bond as an indication that Defendant has no objection to Plaintiffs' contention that a minimal bond, or no bond at all, would serve the purposes of Rule 65(c). While the Court declines to impose no bond at all, it sees no potential for substantial injury to Defendant if it turns out that the preliminary injunction was granted in error. Accordingly, the Court determines that a bond in the amount of $1,000.00 will suffice to advance the purposes of Rule 65(c). Any party that believes that the amount of the bond should be increased or decreased may file an appropriate motion for so long as the preliminary injunction remains in effect. See 13 Moore's Federal Practice, § 65.50[1], at 65-93 (3d ed. 2006).

## III. Conclusion

For the reasons stated above, the Court grants in part and denies in part Plaintiffs' motion for preliminary injunction [18], enters today on a separate document the preliminary injunction to which the Court finds Plaintiffs are entitled, and imposes a $1,000 bond as security for that preliminary injunction.

Dated:  December 11, 2008

_____

Robert M. Dow, Jr.
United States District Judge