**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PROFESSIONAL TOWING & RECOVERY OPERATORS OF ILLINOIS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08-cv-4096 |
| CHARLES E. BOX, in his official capacity as Chairman of the Illinois Commerce Commission & Transportation Division | ) ) ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

The parties' cross-motions for summary judgment ask the Court to decide whether Illinois' Commercial Safety Towing Law (Towing Law), 625 ILCS 5/18d-101, *et seq.* is preempted in whole or in part by the Federal Aviation Administration Act of 1994 (FAAAA), as amended by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 14501(c), because the it has "the force and effect of law related to a price, route, or service of any motor carrier * * * with respect to the transportation of property," but is not part of "the safety regulatory authority of a State with respect to motor vehicles," or whether a dispute over material facts precludes summary judgment. For the reasons stated below, the Court concludes that Towing Law sections 18d-120(a), 18d-125, 18d-150, 18d-160 and 18d-165 are preempted by federal law. The remainder of the Towing Law "is complete in and of itself, and is capable of being executed wholly independently of the severed portion," *People v. Sanders*, 696 N.E.2d

1144, 1149 (Ill. 1998), and so the Towing Law is not preempted in its entirety. Accordingly, the parties' cross-motions for summary judgment [100, 101] are granted in part and denied in part.

## I.      Background

This case concerns a sometimes-dangerous towing scam known as "wreck chasing," Illinois' attempt to combat wreck chasing with towing regulations, and whether those regulations can remain in force despite a federal law that preempts state laws "related to a price, route, or service of any motor carrier * * * with respect to the transportation of property." 49 U.S.C. § 14501(c); *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 430 (2002) ("Tow trucks * * * are 'motor carrier[s] of property' falling within § 14501's compass.").

The concept of a "wreck chaser" applies to towers and towing companies that do a variety of bad things, including: (1) monitoring police scanners to find accidents, (2) speeding to accident sites to solicit business; (3) using strong-arm tactics with owners and operators; (4) brawingl with competing towers who get in their way; (5) towing damaged cars to undisclosed locations; (6) providing car owners and operators with phone numbers that go directly to an answering service and not their tow lots; (7) holding cars longer than necessary; (8) summoning owners and operators to desolate areas to recover vehicles; and (8) charging exorbitant fees, often more than $1,000, and (9) requiring payment in cash. The Court has no information about how many wreck chasers hit all those points, but even entities that hit some of them may be worthy of the name. A tower that solicits a tow at the scene of an accident, tows the car without honestly disclosing how much the tow will cost or where the vehicle will be towed, and charges an exorbitant fee to recover the car probably has done enough to earn the designation. The

parties have documented that towers of this sort cause economic harms (*e.g.*, exorbitant fees) and makes the roads less safe (*e.g.*, speeding to accident scenes, creating disorder at the roadside).

The Commercial Safety Towing Law, 625 ILCS 5/18d-101, *et seq.* is part of Illinois' response to wreck chasing.[1] It regulates "commercial vehicle safety relocators," which it defines as persons or entities "engaged in the business of removing damaged or disabled vehicles from public or private property by means of towing or otherwise, and thereafter relocating and storing such vehicles." 625 ILCS 5/18d-105. The law applies in counties with a population of more than one million and in counties with a population under one million that have adopted the Commercial Relocation of Trespassing Vehicles Law, 625 ILCS 5/18a; 625 ILCS 5/18d-180.

---

[1] Notably, Illinois also has recently enacted an anti-solicitation law:

> Solicitations at accident or disablement scene prohibited. A tower, as defined by Section 1-205.2 of this Code, or an employee or agent of a tower may not: (i) stop at the scene of a motor vehicle accident or at or near a damaged or disabled vehicle for the purpose of soliciting the owner or operator of the damaged or disabled vehicle to enter into a towing service transaction; or (ii) stop at the scene of an accident or at or near a damaged or disabled vehicle unless called to the location by a law enforcement officer, the Illinois Department of Transportation, the Illinois State Toll Highway Authority, a local agency having jurisdiction over the highway, or the owner or operator of the damaged or disabled vehicle. This Section shall not apply to employees of the Department, the Illinois State Toll Highway Authority, or local agencies when engaged in their official duties. Nothing in this Section shall prevent a tower from stopping at the scene of a motor vehicle accident or at or near a damaged or disabled vehicle if the owner or operator signals the tower for assistance from the location of the motor vehicle accident or damaged or disabled vehicle.

525 ILCS 5/11-1431. The anti-solicitation law is not (directly) at issue in this case. The Court will consider the anti-solicitation law only in connection with Plaintiffs' argument that it is the anti-solicitation law and not the Towing Law that is genuinely responsive to safety concerns about wreck chasers. The short answer to that argument is that Illinois is permitted to wear a belt and suspenders. Moreover, there is no evidence that either law is, by itself, a sufficient response to wreck chasing. In the end, the anti-solicitation is a salient background fact but ultimately has little, if any, significance to this case.

Under that rule, the Towing Law applies in 5 of Illinois' 102 counties: Cook, Will, Kane, DuPage, and Winnebago. Its substantive provisions can be summarized as follows:

- Sections 18d-115 and 145 require towing companies engaged in consensual towing[2] to obtain a safety relocator's registration certificate from the Illinois Commerce Commission, for which the companies must pay both an annual and a per-vehicle fee, and require the certificate to be carried in each tow truck;

- Section 18d-120(a) requires towing companies to request specific authorization after the disclosures set forth in 18b-120(b) but prior to towing a damaged or disable vehicle;

- Section 18d-120(b) and (d) require towing companies to provide specific and detailed written disclosures to vehicle owners or operators before towing a damaged or disabled vehicle, and if the owner cannot receive the disclosures then they must be given to local law enforcement and, if known, the owner or operator's insurance company;

- Section 18d-120(c) requires towing companies to maintain copies of completed disclosures for a minimum of five years;

- Section 18d-120(e) prohibits towing companies from seeking any compensation from the vehicle owner or operator and voiding any contracts between the vehicle owner or operator and the tower if the tower fails to comply with section 18d-120(a)-(d);

- Section 18d-125 requires towing companies to issue an itemized final invoice to vehicle operators or owners upon demand and to retain copies of such invoices for a period of five years;

- Section 18d-130 requires towing companies to post signs at their storage facilities advising customers of their rights;

- Section 18d-135 imposes penalties for violations of the recordkeeping requirements in sections 18d-120(b) and 18d-125

- Section 18d-150 prohibits towing companies from including in their contracts with owners or operators of damaged or disabled vehicles clauses that waive or limit the towing companies' liability;

---

[2] Consensual towing occurs when the vehicle operator requests that a tow truck come to the scene of an accident or the location of a disabled vehicle and the vehicle is towed with the knowledge and consent of the operator. Non-consensual towing occurs when a vehicle is towed without the knowledge and consent of the operator or owner — for example, when a car is parked illegally, either on public or private property. In this case, Plaintiffs challenge the Towing Law only as it applies to consensual towing.

- Section 18d-155 imposes penalties and fines for failure to comply with the State Towing Law;

- Section 18d-160 makes noncompliance with the Towing Law an "unlawful practice" within the meaning of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*; and

- Section 18d-165 requires that charges accrued by vehicle owners or operators for consensual tows to be payable by cash or major credit card.

The law is prefaced by a statement of "[p]ublic interest and public welfare":

> The General Assembly finds and declares that commercial vehicle towing service in the State of Illinois fundamentally affects the public interest and public welfare. It is the intent of the General Assembly, in this amendatory Act of the 95th General Assembly, **to promote the public interest and the public welfare by requiring similar basic consumer protections and fraud prevention measures that are required of other marketplace participants**, including the disclosure of material terms and conditions of the service to consumers before consumers accept the terms and conditions. The General Assembly also intends that the provisions in this amendatory Act of the 95th General Assembly **promote safety for all persons and vehicles that travel or otherwise use the public highways of this State**. The General Assembly finds that it is in the public interest that persons whose vehicles are towed from the public highways know important basic information, such as where they can retrieve their vehicles and the cost to retrieve their vehicles, so that they can avoid vehicle deterioration and arrange for a prompt repair of the vehicles.

625 ILCS 5/18d-110 (emphasis added). Thus, on its face, the Towing Law has a mixed purpose: it aims to *protect consumers* and *promote safety*. The law's purpose matters for the Court's preemption analysis because even if a provision of the Towing Law is "related to a price, route, or service" of a tower, and so falls within the general scope of 49 U.S.C. § 14501(c), it will be saved from federal preemption if it is "*genuinely responsive* to safety concerns" and not by virtue of its reasonableness or effectiveness as a measure combating consumer confusion or fraud, see *Ours Garage*, 536 U.S. at 442 (emphasis added); 49 U.S.C. § 14501(c)(2).

The mixed purpose set out in the Towing Law's statement of public interest and public welfare is mostly absent from the law's (rather sparse) legislative history, which is focused

primarily on consumer protection.  When the bill that would eventually become the Towing Law was introduced to the General Assembly on February 8, 2007 as Senate Bill 435 (SB435), it was titled "Truth in Towing" and contained a variety of consumer-disclosure requirements intended to address unfair towing practices.  On February 23, 2007, the first Senate amendment to SB435 proposed, among other things, requiring the Illinois Commerce Commission to set rates for towing damaged or disabled vehicles and changing section 2Z of the Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2Z to make violations of certain sections of Chapter 18a (which would include the "Truth in Towing Law") a violation of ICFA. On March 29, 2007, Senator Maloney, one of SB435's sponsors, told the Senate that the bill "was precipitated by the fact that there are many unscrupulous towing companies out there who take advantage of people who are in car accidents."  He also mentioned that such towers use "police scanners to get to the accident site" and "they don't specify the location that the car is going or the fee."

After reviewing SB435, the Illinois Attorney General was concerned that the rate-setting provisions were preempted by federal law.  The Illinois Commerce Commission agreed, and on May 24, 2007, House Amendment number 3 was filed, removing the rate-setting provisions and adding Chapter 18d to the Vehicle Code and titling it "The Illinois Commercial Safety Towing Law."  On May 29, 2007, House Amendment number 4 was filed.  It replaced the phrase "collision repair facility" with "commercial safety relocator."  During the floor debates, another sponsor, Representative McCarthy, explained that

> Senate Bill 435 Creates the Illinois Commercial Safety Towing Law by adding Chapter 18d to the Illinois Vehicle Code.  This is basically a disclosure bill to address the problem in some of the counties up in the northeast part of the state where some towers were taking advantage of a lot of the local residents because of the fact that the Bill as it came out of the Senate would have been bothered by a federal preemption about setting rates for towers.  We've made this into a

> complete disclosure Bill. * * * So, I think it's a nice move for the citizens of our
> state that they can get some protection when they are in a position where they
> need to have their car towed and they won't be abused by some towers who don't
> do it the right way.

Representative Black asked about the fee-setting provision in a previous version of the bill. He

noted the Attorney General's objections and asked who would be setting the rates.

Representative McCarthy answered:

> [T]he safety relocators will not be under a fee structure imposed by the
> Commerce Commission. * * * But I wanted to get these protections in there for
> our consumers and I said we'll go forward with it as a disclosure Bill this year.

On August 31, 2007, the day he signed the law, Governor Blagojevich's Office issued a press

release titled "Gov. Blagojevich signs 'Truth in Towing" law for Illinois Motorists" with the

subtitle "SB 435 will strengthen motorists' rights and protect them from fraudulent 'safety

relocators.'" The press release quoted Governor Blagojevich: "The last thing anybody should

have to worry about after a car accident is whether person towing their vehicle is going to rip

them off and add to their trouble. * * * This bill will help protect thousands of drivers from

unlicensed towers who prey on accident scenes."[3]

Defendant argues that the Towing Law's consumer-protection focused legislative history

does not mean that it is preempted by federal law, because, when it comes to wreck chasing at

least, consumer protection and safety are two sides of the same coin. To drive that point,

Defendant highlights a behind-the-scenes concern for safety. For instance, Defendant's opening

brief notes that Lori Reimers, a lobbyist for State Farm Insurance who was instrumental in the

development and passage of the Towing Law, "agreed that 'the legislators intended that [SB

---

[3] Governor Blagojevich's statement is some evidence that the real purpose of the Towing Law was
consumer protection and nothing more, but its significance should not be exaggerated. See *Metzl v.
Leininger*, 57 F.3d 618, 618, 621 (7th Cir. 1995) (concluding that a proclamation by the governor
discussing the purposes of a statute enacted the previous year making Good Friday a legal and school
holiday throughout the state "is not definitive evidence of the statute's original purpose").

435] could impact public safety.'" [84 at 14]. And Defendant's expert, Craig Baner, the Operations Commander for the Illinois Commerce Commission Police Department, testified that police agencies in Illinois had "made their local legislators aware of the public safety hazards involved in these wreck chaser tow situations taking place on Illinois roadways." [84 at 14].[4]

Although consumer protection and safety are not logically incompatible, Plaintiffs, Professional Towing & Recovery Operators of Illinois ("PTROI"), Wes's Service, Inc., and North Shore Towing, Inc., nevertheless believe that the Towing Law's stated (and alleged behind-the-scenes) concern with safety is a pretext, and that the Towing Law is therefore preempted as a state law "related to a price, route, or service" of a motor carrier that is not genuinely responsive to the state's interest motor carrier safety. See 49 U.S.C. § 14501(c); *Ours Garage*, 536 U.S. at 442. Plaintiffs have sued Charles Box in his official capacity as Chairman of the Illinois Commerce Commission and Transportation Division. Box is the state official charged with enforcing the Towing Law and so is a proper defendant in a suit seeking prospective relief. See *Ex Parte Young*, 209 U.S. 123, 156 (1908); *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 912 (7th Cir. 2003) ("*Ex Parte Young* * * * authorizes, notwithstanding the Eleventh Amendment, suits for prospective injunctive relief against state officials who as in this case are sued in their official capacity"); *Illinois Ass'n of Mortg. Brokers v. Office of Banks and Real Estate*, 308 F.3d 762, 764-65 (7th Cir. 2002).

---

[4] In their Rule 56.1(b)(3) response to Defendant's statement of material facts, Plaintiffs repeatedly object to Baner's expert report because it was unsigned. Defendant has addressed Plaintiffs' concern by filing supplemental declaration verifying Baner's report [91, 93]. Setting aside the now-remedied problem of the unsigned report, Baner's testimony about the Towing Law is admissible. Baner has years of experience a police officer, where his duties included handling traffic crashes. He is currently the Illinois Commerce Commission Police Commander, and in that role has been responsible for review and evaluation of over 5,000 commercial towing complaints and investigations. He has a reliable basis for his testimony about the origin and impact of the Towing Law.

Plaintiffs previously moved for a preliminary injunction [14]. On the limited record then before the Court and with the overlay of the preliminary injunction standard, the Court's conclusion was mixed [29]. Several provisions of Illinois' Towing Law appeared to have only a "tenuous, remote, or peripheral" impact on a tower's rates, routes, or services and so were outside the scope of § 14501(c)(1), *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992), while other sections appeared to have a significant connection to towers' services or rates and could not be saved by the safety exception in § 14501(c)(2). See *Ours Garage*, 536 U.S. at 442. The parties have now filed cross-motions for summary judgment [100, 101], and so present the preemption issue again, but this time on a fuller record.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). On cross-motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary

judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    The Scope of Preemption under 49 U.S.C. § 14501(c)

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819), it has been settled that state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). When considering preemption, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, the "purpose of Congress" is the ultimate touchstone of preemption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

To understand Congress' purpose, the first consideration is the text of the federal law, in this case, § 14501(c).  In relevant part, it states:

> (1) General rule. – Except as provided in paragraphs (2) and (3), a State * * * may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier * * * with respect to the transportation of property*.
>
> (2) Matters not covered. – Paragraph (1) –
>
>> (A) *shall not restrict the safety regulatory authority of a State with respect to motor vehicles*, the authority of a state to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization; * * *

49 U.S.C. § 14501(c) (emphasis added).

Section 14501 had its genesis in the Airline Deregulation Act of 1978 (ADA), 92 Stat. 1705, which, true to its name, "largely deregulated the domestic airline industry."  *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1775 (2013).  The ADA aimed to "ensure that states would not undo federal deregulation with regulation of their own" *Id.* (quoting *Morales*, 504 U.S. at 378).  To that end, the ADA included a preemption provision, prohibiting states from enacting or enforcing any law "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).  Two years later, when Congress decided to deregulate trucking, it borrowed the language of the ADA, substituting "motor carrier" for "air carrier."  See Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793.  The Motor Carrier Act "lifted most restrictions on entry, on the goods that truckers could carry, and on routes.  It did not, however, eliminate the requirement to file tariffs, nor did it end the power of state regulatory commissions to limit entry and regulate prices."  *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 548 (7th Cir. 2012).

11

Congress further limited states' ability to regulate trucking by enacting the Federal Aviation Administration Authorization Act of 1994 (addressing air and motor carriers). "Borrowing from the ADA's preemption clause, but adding a new qualification, * * * the FAAAA supersedes state laws 'related to a price, route, or service of any motor carrier . . . *with respect to the transportation of property*.'"  *Dan's City*, 133 S. Ct. at 1775 (quoting 49 U.S.C. § 14501(c) and adding emphasis).  That added phrase "'massively limits the scope of preemption' ordered by the FAAAA."  *Id.* at 8 (quoting *Ours Garage*, 536 U.S. at 449 (Scalia, J. dissenting)). Under this restriction "it is not sufficient that a state law relates to the 'price route or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.'" *Id.*  According to Title 49, "transportation" encompasses "services related to [the] movement [of passengers or property], including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." § 13102(23)(B).

Because of the similarity of the preemption provisions — the FAAAA (at issue in this case) copies the language of the ADA — cases interpreting the preemption provision of the ADA will be equally instructive and controlling in this case.  See *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 370 (2008) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates as a general matter, the intent to incorporate its judicial interpretations as well")).

Interpreting the ADA in *Morales v. Trans World Airlines, Inc.*, the Supreme Court concluded that the critical phrase, "relating to," expressed "a broad pre-emptive purpose" and thus prohibited "[s]tate enforcement actions having a connection with, or reference to" the "rates,

12

routes, or services" of carriers.   504 U.S. at 384.   If a state law does not explicitly refer to a carrier's rates, routes, or services (a law of general applicability, for instance) it still will be preempted only if it has a "significant impact" on Congress' deregulatory objectives. Conversely, a state law will not be preempted if it affects federal goals "in only a tenuous, remote, or peripheral * * * manner." *Dan's City*, 133 S. Ct. at 1778 (quoting *Morales*, 504 U.S. at 390); *S.C. Johnson*, 697 F.3d at 550 (discussing *Morales* and its lesson that preemption is not "a simple all-or-nothing question"); see also *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000) ("[A] claim is preempted if *either* the state rule expressly refers to air carriers' rates, routes, or services, or application of the state's rule would have "'a significant economic effect upon them.'") (quoting *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996)).   In view of the principles it articulated, the Supreme Court held in *Morales* that state consumer fraud statutes could not be enforced to block deceptive airfare advertisements.   504 U.S. at 390-91.

In *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364 (2008), the Court considered whether the FAAAA preempted two provisions of a Maine tobacco law that regulated the delivery of tobacco to customers in the state.   The challenged provisions required tobacco shippers to use a delivery service that verified the buyer's legal age and imposed on carriers constructive knowledge that packages originating from certain senders contained tobacco products, thereby requiring the carriers to check each shipment against the list of proscribed shippers.   *Id.* at 368.   Those legislative mandates, the Supreme Court observed, would "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future."   *Id.* at 372.   The

Court therefore had no difficulty concluding that both provisions were preempted as improper state interference with competitive market forces. *Id*. at 375-76.

*Rowe*'s rule that a state cannot require carriers "to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future," *id*. at 372, cannot be applied in difficult cases without a definition of services. The Seventh Circuit has adopted a definition used by the Fifth Circuit:

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another . . . . [This] leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

*Travel All Over the World*, 73 F.3d at 1433 (quoting *Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir. 1995) (en banc)). This is a broad contractual approach that "include[s] all elements of the [motor] carrier service bargain." *Id* at 1434; see also *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 226 (1995) (holding that "services" include both matters that are both essential and non-essential to the carrier's operations). As the Seventh Circuit recently put it, "services" include a "bargained for or anticipated provision of labor from one party to another." *S.C. Johnson*, 697 F.3d at 556; but see *Charas v. Trans World Airlines, Inc*., 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc) (defining services more narrowly as "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail [*but not* the] provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities"); see also *Air Transport Ass'n of America v. Cuomo*, 520 F.3d 218, 223 (2d Cir. 2008) (noting that only the Third and Ninth Circuits have adopted the narrower definition and that those approaches appear inconsistent with *Rowe*).

*Dan's City* provides some additional guidance on the meaning of services. See 133 S. Ct. at 1776-80. In that case, the plaintiff's apartment complex required tenants to remove their cars from the parking lot after snowstorms. The plaintiff failed to follow this rule and so the landlord had his car towed and stored by a private tower, Dan's City. The plaintiff did not realize that his car had been towed, however, because he had been hospitalized with a serious medical condition. While the plaintiff was hospitalized, the tower attempted to find the car's owner. When the owner was not found, the tower planned to sell the plaintiff's car at auction. Two days before the scheduled auction, and two months after the car was originally towed, the plaintiff's attorney located the car and informed the tower that the plaintiff wanted to pay any charges owed and reclaim his vehicle. The tower did not accept the offer and disposed of the car. The plaintiff sued the tower in state court, alleging a variety of claims under state law related to the disposal of his car. The tower responded that the plaintiff's claims were preempted by the FAAAA. The trial court agreed and granted summary judgment for the tower. The state supreme court reversed, and the Supreme Court affirmed. The plaintiff's claims were not preempted because they were "unrelated to a 'service' a motor carrier renders its customers."

> The transportation service Dan's City provided was the removal of [the plaintiff's] car from his landlord's parking lot. That service, which did involve the movement of property, ended months before the conduct on which [the plaintiff's] claims are based. His claims rely on New Hampshire's abandoned vehicle disposal regime, * * * [which] has neither a direct nor indirect connection to any transportation services a motor carrier offers its customers. We need not venture an all-purposes definition of transportation "service[s]" in order to conclude that state-law claims homing in on the disposal of stored vehicles fall outside § 14501(c)(1)'s preemptive compass.

*Id.* at 1779 (citation omitted). Thus, although binding precedent requires the Court to apply the term "services" broadly, *Dan's City* reminds the Court that FAAAA preemption applies only to *transportation* services. It is a simple but critical qualification. States are not generally

prohibited from enacting or enforcing laws related to the prices, routes, or services of towers; states are prohibited from enacting or enforcing laws related to the prices, routes, or services or towers *with respect to the transportation of property*.

For the purposes of this case, the final critical feature of FAAAA preemption is the so-called safety exception in § 14501(c)(2)(A). In *Ours Garage*, the Supreme Court explained that "[i]t is the expressed intent of § 14501(c)(2)(A) that the preemption rule of § 14501(c)(1) 'not restrict' the *existing* 'safety regulatory authority of a State.'" 536 U.S. at 438. The Supreme Court added that "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property * * * 'not restrict' the preexisting and traditional state police power over safety." *Id.* at 439. The Court further explained how to reconcile the deregulatory purpose of the Act as a whole with the preservation of state safety regulatory authority. According to the Court, "declarations of deregulatory purpose * * * do not justify interpreting through a deregulatory prism 'aspects of the State regulatory process' that Congress determined should *not* be preempted." *Id.* at 440. That construction reflects the Court's view that "[a] congressional decision to enact both a general policy that furthers a particular goal and a specific exception that might tend against that goal does not invariably call for the narrowest possible construction of the exception." *Id.* Nevertheless, while rejecting the "narrowest possible construction," the Court made clear that "[l]ocal regulation of prices, routes, or services of tow trucks that is not *genuinely responsive to safety concerns* garners no exemption from § 14501(c)(1)'s preemption rule." *Id.* at 442 (emphasis added).

Applying *Ours Garage*, the Fifth Circuit held that a state law is not genuinely responsive to safety concerns if it is a means of "accomplishing some economic regulation, or more precisely consumer protection, while making findings about safety in the preambles of their

16

ordinances." *VRC LLC v. City of Dallas*, 460 F.3d 607, 615 (5th Cir. 2006). Similarly, the Second Circuit explained that whether a state law is "genuinely responsive" to safety concerns depends both on the state government's purpose in enacting the law as well as what the law actually does. See, *e.g.*, *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006) (considering "specific expressions of legislative intent * * * as well as legislative history" and assessing those "purported safety justifications * * * in light of existing record evidence"); *cf. Tillson v. City of San Diego*, 406 F.3d 1126, 1129 (9th Cir. 2005) ("The focus of the safety exception to preemption must be on the legislative intent and whether the legislature was acting out of safety concerns."). Thus, in cases like this, where there is a claimed safety purpose, the state law will not be outside the scope of federal preemption if the "purported safety regulation [is a] Trojan horse for undue economic regulation." *California Tow Truck Ass'n. v. City & County of San Francisco*, 2013 WL 791265, at *4 (N.D. Cal. Mar. 2, 2013). By the same token, "[t]he mere existence of a consumer protection (or other non-safety motive) is not * * * problematic in and of itself. Nothing forbids legislatures that enact towing regulations from harboring mixed motives, so long as their motor vehicle safety motivation is not pretextual and the regulations they enact have a sufficiently logical connection to motor vehicle safety." *Id.* at *8; *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2008 WL 4294282, at *11-*12 (C.D. Cal. Sept. 9, 2008) (state laws may avoid preemption even if they were not enacted "for the exclusive purpose of promoting safety").

These rules frame a two-part analysis for each challenged provision of the Towing Law. First, it is the Plaintiff's burden to show that a provision of the Towing Law falls within the scope of § 14501(c)(1). If they carry their burden, the Court's second step is to decide whether the Defendant can establish that 14501(c)(2)'s safety exception applies because the provision is

"genuinely responsive to safety concerns." *Ours Garage*, 536 U.S. at 442; *see also New Jersey Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 240 (3d Cir. 2002) ("[O]nce the party seeking preemption sustains its burden of showing that a local municipality has [enacted an ordinance that would fall within the federal statute's general preemption language], the burden of proving that the regulation comes within the [exception to preemption] falls on the defendant municipality."); *Helmrich Transp. Systems, Inc. v. City of Philadelphia*, 2004 WL 2278534, *3 (E.D. Pa. Oct. 8, 2004) (plaintiff's burden to establish that state law falls within § 14501(c)(1) and defendant's burden to show that state law is not preempted because it is within § 14501(c)(2)'s safety exception).

### B.      Analysis of Each Challenged Provision of the Towing Law

The purpose of SB435, the "Truth in Towing" bill that eventually became the Towing Law, was consumer protection.  Soon after its proposal, legislators learned that a consumer-protection law regulating the towing industry almost certainly would be preempted by federal law.  Fortunately for the bill, wreck chasing, the phenomenon that prompted the push for consumer-protection measures, is also a safety hazard — a real one, the Court does not doubt that.  Faced with the preemption problem, the legislature decided to emphasize safety: towers were given the over-the-top designation "commercial vehicle safety relocators" and the name of the proposed law was changed from Truth in Towing to the Commercial Safety Towing Law. Thus, in the end, the Court is presented with a law created for consumer protection, but also justified (at least in part) by concerns about the unsafe practices of wreck chasers.  To adjudicate the parties' cross-motions, the Court is left to comb through the Towing Law to decide what parts of the law can only reasonably be justified as consumer-protection measures and what parts

18

of the law are genuinely responsive to concerns about safety.  Unlike cases such as *Loyal Tire*,

445 F.3d 145, where the purported safety purpose of a law targeting one disfavored tower was

clearly pretextual, or *Cole v. City of Dallas*, 314 F.3d 730, 735 (5th Cir. 2002), where it was

manifest that a law requiring a criminal background check was within the safety exception, this

case presents the Court with a number of close calls and results in a split decision.  The Court

believes that its provision-by-provision approach is consistent with cases on FAAAA

preemption, see, *e.g.*, *S.C. Johnson*, 697 F.3d at 550 (FAAAA preemption is not "a simple all-or-

nothing question"), as well as the basic principle that even in cases of express preemption "when

the text of a pre-emption clause is susceptible of more than one plausible reading, courts

ordinarily 'accept the reading that disfavors pre-emption,'" *Altria Group., Inc. v. Good*, 555 U.S.

70, 77 (2008) (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005).  See also

*California Tow Truck Ass'n v. City & Cnty. of San Francisco*, 693 F.3d 847, 860 (9th Cir. 2012)

(vacating a district court's judgment and remanding for a provision-by-provision analysis

because without a provision-by-provision analysis "a single valid excepted provision would

allow a vast amount of nonexcepted provisions to stand.  Similarly, the mere fact that one part of

the regulatory scheme is preempted does not mean that other parts of the scheme are preempted,

or that the scheme as a whole is preempted.") (internal citation omitted).

### 1.    Section 18d-115 – Registration Certificate

Section 18d-115 makes it "unlawful for any commercial safety vehicle relocator to

operate * * * without a valid, current safety relocator's registration certificate issued by the

Illinois Commerce Commission. * * * The Commission may, at any time during the term of the

registration certificate, make inquiry, into the licensee's management or conduct of business or

otherwise, to determine that the provisions of this Chapter and the rules of the Commission adopted under this Chapter are being observed." Section 18d-145 requires towers to carry a copy of their registration certificate in their cab. According to the rules adopted by the Illinois Commerce Commission, towers must register annually by completing the Commission's Safety Relocator Registration form and pay registration fees of $450 per business and an additional $150 per tow truck. 92 Ill. Admin. Code §§ 1715.10, § 1715.20, 1715.70. The registration form asks for basic information about the applicant business, including its trade name, address, names of partners of an LLC, and a description of each vehicle that will be used to conduct towing operations. "If the form is properly completed, proof of insurance is provided * * * and payment received * * * a Safety Relocator Annual Registration shall be issued by the Commission." 92 Ill. Admin. Code § 1715.30.

Plaintiffs argue that the registration requirement is related to the service of consensual towing and is not saved as a response to safety concerns about wreck chasing. At the preliminary injunction stage, the Court doubted that the registration requirement is related to the prices or services of towers. The Court focused on registration fees, and found persuasive *Helmrich Transp. Systems, Inc. v. City of Philadelphia*, 2004 WL 2278534, at *4 (E.D. Pa. 2004), which concluded that similar registration fees imposed "practical impediments" that were "so low that any effect on the towing companies' prices, routes, or services can only be called 'indirect, remote or tenuous.'" The Court still finds *Helmrich* persuasive, but it does not adequately respond to Plaintiffs' argument, which is not focused on the effect of registration fees on prices. Plaintiffs' argument is more basic: the registration requirement is related to services because it is a necessary condition of services. No registration, no consensual towing services.

Therefore, the registration requirement is related to a service, to wit, all consensual towing services.

Defendant claims that "courts have rejected this type of logic," and cited *Helmrich* in support. [84 at 24]. And, indeed, the court in *Helmirch* stated that although the licensing requirements "forbid [the plaintiff] from operating in Philadelphia without the appropriate licenses, and thus do 'restrict' its routes and services to some extent, it does not follow that the ordinances 'relate' to routes and services within the meaning of § 14501(c)(1)." *Id.* at *3. But as this Court did at the preliminary injunction stage, *Helmrich* focused *exclusively* on the remote impact that registration fees would have on prices or services. So, although *Helmrich* provides a good quote for Defendant, *Helmrich* did not generally reject the "logic" of Plaintiffs' argument or offer any reasons that it should be rejected. More importantly, the Court finds no support for Defendant's claim that "courts" have rejected arguments like Plaintiffs'. For example, consider Judge Breyer's opinion in a recent case from the Northern District of California:

> [The permit requirements for towers and tow firms] clearly have 'more than an indirect, remote, or tenuous effect on' the services of tow truck drivers and firms operating within San Francisco, since tow truck drivers cannot lawfully render services at all without a City-issued permit. Accordingly, the City's tow-driver and tow-firm permit requirements are preempted unless they relate to one of the three areas where the City's regulatory authority has been excluded from FAAAA preemption: motor vehicle safety, minimum insurance requirements, or the price of non-consensual tows.

*California Tow Truck Ass'n.*, 2013 WL 791265, at *11 (internal citations omitted). So, although the registration requirement does not structure how the services will be provided to owners or operators in need of a tow, it restricts which towers can provide that service at all, and so limits who can participate in the market. The FAAAA has a "broad pre-emptive purpose," *Morales*, 504 U.S. at 384, and the Court believes that it would be inconsistent with that purpose to conclude that a strict condition of towing services is not related to a towing service. *See United*

*Parcel Service, Inc. v. Flores-Galaraza*, 318 F.3d 323, 335-36 (1st Cir. 2003) (Puerto Rico law concerning delivery of packages related to a service where no delivery could be made "unless and until a recipient produces a certificate from the [Secretary of the Department of Treasury of Puerto Rico]").

But the Court need not dwell on this point, for even if the registration requirement is "related to a * * * service" within the meaning of § 14501(c)(1), it would not be preempted for at least two reasons. First, towers cannot obtain a registration certificate without providing proof of insurance, and so the registration requirement is one of the ways that Illinois ensures that towers comply with minimum insurance requirements. Federal preemption does not extend to "the authority of a state to regulate motor carriers with regards to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization," 49 U.S.C. § 14501(c)(2)(A), and Plaintiffs cannot be heard to challenge a check on towers' compliance with minimum insurance requirements any more than they could challenge the minimum insurance requirements themselves.

Second, the registration requirements are genuinely responsive to motor vehicle safety. There is no dispute that wreck chasing is a safety concern. For example, PTROI president Bill Howard characterized wreck chasing as "an activity conducted by extremely unprofessional, sometimes criminal individuals" who speed and drive recklessly on the way to accident scenes and, once there, have engaged in "violent behavior." There is also no dispute that wreck chasers tend to be unregistered. Discussing his concerns about the registration requirement, Bill Howard explained that

> There's already registrations that tow operators must have. We spoke about the common carrier authority earlier. Also, if we are a private property relocator, we have to have a license and numbers on our door for that. In addition, most of us have a DOT number. A lot of us have an Interstate Commerce Commission

22

> number.  I mean, the licensing is extensive.  And just feel that [the registration requirement in the Towing Law] is redundant and unnecessary.
>
> Q: To your knowledge or experience, do you believe that most wreck chasing tow trucks would have these additional registrations?
>
> A: No, I don't believe they have any registrations whatsoever.

[84-2 at 114].  The registration requirement advances the stated safety purpose of the Towing Law by attacking the *modus operandi* of a group of towers that endanger motor vehicle safety. That is, wreck chasers are generally unregistered, and the Towing Law requires registration and imposes penalties for operating without proper registration.  For the purposes of preemption, there is no requirement that a state law concerned with motor vehicle safety address safety *directly*, with operating rules, for example; the requirement is only that the law be "*genuinely responsive* to safety concerns."  *Ours Garage*, 536 U.S. at 442.  In the Court's opinion, the registration requirement does that.

Plaintiffs argue that the Court should conclude that the registration requirement is not genuinely responsive to safety concerns because of what it *lacks*.  Specifically, Plaintiffs criticize the law because it does not include a criminal background check or fitness standard.  See, *e.g.*, *Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1251-52 (11th Cir. 2003) (registration requirement that included background within safety exception); *Cole*, 314 F.3d at 735 (ordinance prohibiting individuals with certain criminal convictions from obtaining a wrecker driver's permit within safety exception).  Under the Towing Law, once the minimal registration requirements are met, a registration certificate is issued.  The registration requirements are so minimal, in fact, that known wreck chasers have been able to obtain registration certificates.  For instance, Road American Automotive, Inc. was sued by Allstate

Insurance in 2006 and the Illinois Attorney General in 2007, but it was issued a registration certificate in 2008.

The issue presented to the Court, however, is not whether there are obvious ways in which the registration requirement could be better, whether it addresses all safety concerns, or whether the concerns that it purports to address are also addressed by other state laws (like the anti-solicitation law). Assuming that the registration requirement relates to a service of a motor carrier, the question for the Court is whether the law is genuinely responsive to safety concerns. Based on the record, there is no question that the registration requirement frustrates wreck chasing. By doing so, it is responsive to concerns about safety.

Finally, Defendant has supported its claims that the Towing Law has actually improved safety on the roads. For instance, Plaintiffs do not dispute the assertion by Defendant's expert, Craig Baner, the Operations Commander for the Illinois Commerce Commission Police Department, that since the Towing Law went into effect, the Illinois Commerce Commission has seen a "drastic decrease" in the number of complaints about behavior characteristic of wreck chasers. As for the registration requirement in particular, Baner testified that it "allows for Police Officers at a scene to immediately identify who has proven financial responsibility * * * and has authority to conduct * * * consensual tows [and that] has been critical in reducing the time spent at these scenes." [84-7 at 4]. And, as Plaintiffs' expert emphasizes, "[f]rom the time that a roadway incident occurs, the clock is ticking until that incident causes another incident." Plaintiffs' expert report at 6. That evidence makes this case distinguishable from *Automobile Club of New York v. Dykstra*, 520 F.3d 210, 216 (2d Cir. 2008), where a licensing scheme was held to be preempted where the defendant did "not present[] any evidence" to support its argument that the regulations improved public safety.

24

In short, the registration requirement is a small piece of the Towing Law's broader response to a safety concerns about wreck chasing. There is no authority for Plaintiffs' assumption that because the registration requirement is only a small part of the law that it cannot be genuinely responsive to safety concerns. Accordingly, sections 18d-115 and 18d-145 are outside the scope of federal preemption.

### 2.    Section 18d-120(a) – Specific Authorization Requirement

Subsection 18d-120(a) provides that "[a] commercial vehicle safety relocator shall not commence the towing of a damaged or disabled vehicle without specific authorization from the vehicle owner or operator after the disclosures set forth in this Section." The Illinois Commerce Commission's regulations detail how the tower must obtain authorization depending on the condition or capacity of the owner or operator. If the owner or operator is present at the scene and able to sign, the tower must obtain a written signature before towing his or her vehicle. If the owner or operator is not present at the scene or is otherwise incapacitated, the tower must (a) record the name, mailing address and telephone number of the person giving the authorization; the date the authorization was given; and the driver's license, social security or other unique identifying number of the person authorizing the tow, and (b) provide basic information about the tower, where the vehicle will be towed, cost of the tow and storage to either the law enforcement agency with jurisdiction or the insurance agent for the vehicle owner or operator. 92 Ill. Admin. Code §1715.120.

At the preliminary injunction stage, the Court concluded that the specific authorization requirement relates to a service, has more than an "indirect, remote, or tenuous" effect on the total package of services provided by a towing operator, and was therefore within the scope of §

14501(c)(1).    See *Helmrich*, 2004 WL 2278534, at *4 (holding that a similar specific authorization provision that attempted to "regulate * * * the way in which towing companies relate to their clients" and thus fell within the scope of federal preemption).  The Court did not see how a specific authorization requirement for consensual tows could be saved by the safety exception.  A consensual tow is by definition an authorized tow, so 18d-120(a)'s requirement that there be an authorization that follows formal, state-mandated procedures (and includes price disclosures) looked like consumer protection.  It might be a good business practice, the Court noted, but it did not appear to be within the safety exception.

Defendant asks the Court to reconsider its conclusion that the specific authorization requirement relates to services because specific authorization does not "frustrat[e] deregulation" by "interfering with matters about which [towers] compete."  *Torraco v. American Airlines, Inc.*, 1996 WL 6560, at *4 (N.D. Ill. Jan. 4, 1996).  If that statement from *Torraco* is still good law, it must be understood broadly in light of the definition of "services" in *Travel All*, which "include[s] all elements of the [motor] carrier service bargain."  73 F.3d at 1434.  For example, in the airline context, "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself" count as "services" for the purposes of federal preemption.  *Id.* at 1434 (quoting *Hodges*, 44 F.3d at 336).  If regulation of the method by which an airline loads travelers onto its airplanes or provides soft drinks is related to an airline's services, then it stands to reason that regulation of the procedures for beginning a tow is related to a service with respect to the transportation of property.  See *Dan's City*, 133 S. Ct. at 1775.  They are both elements of the service bargain, even if not the main event.  See *Wolens*, 513 U.S. at 226 ("services" include both matters that are both essential and non-essential to the carrier's operations).

The specific authorization requirement will be preempted unless it is genuinely responsive to safety concerns. To show that it is, Defendant points to its expert's testimony that a "signature is the only true way to show authorization" and, for law enforcement, "would be critical in a follow-up investigation." It may well be true that a signature would be critical for a follow-up investigation (as would the disclosure form), but it would be an investigation of automobile theft, not of safety problems caused by wreck chasers. See *Helmrich*, 2004 WL 2278534, at *5 (specific authorization requirement not within safety exception). Finally, specific authorization cannot be justified on the same basis as registration — as an attempt to interfere with a distinctive way that wreck chasers do business — for the specific authorization requirement does nothing more than specify *how* towers must do something that is already required for consensual tows. The *method* of consent for consensual tows is not genuinely responsive to safety concerns, however nice it may be for consumers. Subsection 18d-120(a) is preempted.

### 3. Section 18d-120(b) - (e) – Written Disclosures

Subsection 18d-120(b) requires that towers give owners or operators a written disclosure before a tow. That disclosure must include:

(1) The formal business name of the commercial vehicle safety relocator, as registered with the Illinois Secretary of State, and its business address and telephone number.

(2) The address of the location to which the vehicle shall be relocated.

(3) The cost of all relocation, storage, and any other fees, without limitation, that the commercial vehicle safety relocator will charge for its services.

(4) An itemized description of the vehicle owner or operator's rights under this Code, as follows:

"As a customer, you also have the following rights under Illinois law:

(1) This written disclosure must be provided to you before your vehicle is towed, providing the business name, business address, address where the vehicle will be towed, and a reliable telephone number;

(2) Before towing, you must be advised of the price of all services;

(3) Upon your demand, a final invoice itemizing all charges, as well as any damage to the vehicle upon its receipt and return to you, must be provided;

(4) Upon your demand, your vehicle must be returned during business hours, upon your prompt payment of all reasonable fees;

(5) You have the right to pay all charges in cash or by major credit card;

(6) Upon your demand, you must be provided with proof of the existence of mandatory insurance insuring against all risks associated with the transportation and storage of your vehicle."

Towers may make the required disclosures on a generic disclosure form created by the Illinois Commerce Commission, or towers may use their own forms, so long as they are approved by the Commission. 92 Ill. Admin Code § 1715.100. Subsection 18d-120(d) provides that if the vehicle owner or operator is incapacitated or otherwise unable to receive the disclosure form, it must be provided to local law enforcement and, if known, the owner or operator's insurance company. Subsection 18d-120(c) requires towers to retain copies of the written disclosures for at least five years. Subsection 18d-120(e) prohibits a tower from seeking compensation and voids any contract for services if the tower fails to comply with Towing Law's disclosure requirements.

At the preliminary injunction stage, the Court did not enjoin the disclosure rules because it did not believe that it was in a position to say whether the law was related to a service — that is, whether the disclosure requirements relation to a service with respect to the transportation of property was too remote to fall under the general rule of § 14501(c)(1), and, if it did, whether it

was genuinely responsive to safety concerns.  On the fuller record now before it, the Court has no difficulty reaching the conclusion that the disclosure requirements relate to a service, and not in such a remote or tenuous way that they are outside the scope of federal preemption. Estimating all the costs ("without limitation") of the tow and storage, even if it can be done quickly, relates to the service of transporting a disabled vehicle.  If there were no such requirement, it is easy to imagine a tower's ad: "We always provide a full, detailed estimate before we tow!  And if we don't give you an estimate before we tow your car, we won't charge you a penny."  Subsection 18d-120(a) together with 18d-120(e) requires all Illinois towers covered by the Towing Law to make that promise.[5]

Whether the disclosure requirements are genuinely responsive to safety concerns is a closer question.  Defendant argues that the disclosure requirements "promote[] safety by expediting the recovery of vehicles."  Defendant further contends that "[c]ourts have recognized that legislation which 'tends to expedite recovery of [customers'] vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public' *Renne v. Servantes*, 86 Cal. App. 4th 1081, 1091 (Cal. Ct. App. 1st Dist. 2001)." [84 at 40].  Zooming out on that snippet form *Renne*, it is obvious why Defendant's car-recovery argument is unpersuasive here:

> It cannot be doubted that the **unexpected loss** of the use of one's vehicle directly affects the safety and welfare of vehicle operators and owners.  A person may be stranded hundreds of miles from home with no alternative mode of return travel and with no place to stay until the vehicle can be recovered . . . .  Legislation which tends to assist members of the public from **involuntarily** losing the use of their vehicles and which tends to expedite recovery of their vehicles once they have been removed fairly and clearly promotes the safety and welfare of the public.

---

[5] The disclosure requirements may also fall within § 14501(c)(1) because they are related to price.  If "[p]rice advertising surely 'relates to' price," *Morales*, 504 U.S. at 389 (quoting *Illinois Corporate Travel v. American Airlines, Inc.,* 889 F.2d 751, 754 (7th Cir. 1989)), then it stands to reason that all-in price disclosures do too.

*Id.* (emphasis added) (quoting *Berry v. Hannigan*, 7 Cal. App. 4th 587, 591 (Cal. Ct. App. 1st Dist. 1992). This case is not about unexpected tows; nobody is involuntarily losing the use of their vehicle. This case is about consensual tows, and so the concerns voiced in *Renne* are out of place.

Defendant's broader safety argument is more persuasive. Like the registration requirements (section 18d-115), the disclosure requirements are genuinely responsive to safety concerns because they attack the way that typical wreck chasers operate. Wreck chasers do not want to disclose where they are taking vehicles, where their business is located, precisely what they are going charge, and the customer's rights. By requiring towers to do those things, the Towing Law forces wreck chasers off the road, and that makes Illinois roads safer. Of course, the disclosure requirements also protect consumers from some of the inconveniences and economic harms caused by wreck chasers. If the safety benefits here were so minor or speculative that it would be difficult to understand them as anything other than a convenient cover for economic regulations, then the mixed justification for the law would be problematic. But because there is no question that wreck chasing is a safety concern, and, like the registration requirement, that the disclosure requirement makes it difficult for wreck chasers to operate, the regulation avoids federal preemption even though it smuggles-in economic regulations, and does so intentionally. In short, the fact that the law is genuinely responsive to two sets of concerns is not a basis for concluding that it is preempted.

### 4.  Section 18d-125 – Itemized Final Invoice

Section 18d-125 requires towing companies to provide, on the customer's demand, a detailed, "itemized final invoice" of charges and to retain copies of such invoices for five years.

30

Among other things, the invoice must list the odometer reading, any modifications made by the tower, any observable damage prior to the owner or operator's release of the vehicle to the tower, and an itemized list of charges. This provision relates to the property-transportation services that that covered towing companies provide by regulating what the tower must document before and after the tow, and what the tower must do (upon customer demand) when it returns the vehicle to the owner or operator. See *Dan's City*, 133 S. Ct. at 1779 (transportation includes services related to delivery and interchange of property). In the words of *Rowe*, the final invoice requirement "require[s] carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future." 552 U.S. at 375-76. The final invoice requirement relates to a property-transportation service, and so whether the requirement is onerous, sensible, or is something that any decent tower would be happy to do is irrelevant to preemption. The invoice requirement will be preempted unless it is genuinely responsive to concerns about safety.

In its opening brief, Defendant does not argue that the invoice requirement, in particular, has anything to do with safety. [84 at 40-41]. In its reply brief, Defendant argues that the final invoice requirement (together with the disclosure and signage requirements), "has helped to reduce the number of calls to the police for disturbances at tow storage facilities." [98 at 29]. Defendant's best supporting evidence for that proposition is Baner's testimony that there have been fewer complaints about disturbances at tow storage facilities since the towing law went into effect. Assuming Baner's testimony to be true, Court is still left to speculate about whether the invoice requirement, in particular, has anything to do with the fact that there have been fewer complaints and what that has to do with safety. And, as explained above, the Court allows that even if attacking the way wreck chasers operate may be genuinely responsive to safety concerns,

not all towing regulations that require towers to do something that wreck chasers probably won't do can reasonably be characterized as a response to safety concerns. It's a simple point: Wreck chasers are unprofessional towers, but not all regulations mandating best practices are thereby outside the scope of preemption.

It may seem that the Court is splitting hairs by concluding that the safety exception justifies detailed disclosures at the beginning of a transaction but not at the end, with an itemized final invoice. The difference between the two requirements is that the disclosure requirement forces would-be wreck chasers to do precisely what they do not want to do: tell customers where their cars will end up and exactly how much it will cost. And unlike with the disclosure requirement, the parties have not drawn the Court's attention to any evidence that wreck chasers (in particular) are notorious for failing to offer detailed invoices. Thus, the Court concludes that the itemized final invoice requirement is a consumer protection measure related to a property-transportation service but not genuinely responsive to safety concerns. As such, it is preempted by federal law.[6]

### 5. Section 18d-130 – Signage at Facilities

Section 18d-130 requires towing companies to display at their storage facilities signs advising customers of their rights under the Towing Law. At the preliminary injunction stage, the Court saw no preemption problem, provided that the information on the sign is accurate — that is to say that the sign does not suggest to customers that towing companies must comply with any provisions of the Towing Law that are determined to be preempted. The Court reached that conclusion because a sign at a storage facility is either not related to property-transportation

---

[6] Of course, many who provide a detailed invoice in this way will do so on the way out as a good business practice, whether or not it is required by law.

service, or is related in such a "tenuous, remote, or peripheral" way, that it is outside the scope of § 14501(c)(1). See *Helmrich*, 2004 WL 2278534, at *4 (requirement that towers post on the tow-truck door that a "certified fee schedule is available from the driver" not related to a service).

Plaintiff asks the Court to take a different position at summary judgment and in support cites *Air Transport Ass'n of America v. Cuomo*, 520 F.3d at 218. *Air Transport* involved a New York law that required, for all flights grounded on New York runways for more than three hours, that passengers be provided with (a) electric generation service for temporary power, fresh air, and lights; (b) waste removal service for the restrooms; and (c) adequate food and drinking water and other refreshments. *Id.* at 220. The law also required that airlines display these rights. *Id.* The Second Circuit had no trouble concluding that the state law was preempted in its entirety by the ADA. *Id.* at 223. The problem, however, was not with a display of rights, but with the "rights" themselves.

As it did at the preliminary injunction stage, the Court does not believe that the required display of non-preempted right is sufficiently related to a property-transportation service to fall within § 14501(c)(1). But to the extent that it is related to a property-transportation service, it would be related to (and supportive of) non-preempted services, and so would not be preempted for the same reasons that the penalty provision is not preempted: it would make no sense to conclude that certain provisions of the Towing Law are not preempted because they are genuinely responsive to safety concerns, but that the state is forbidden from taking measures to make those provisions effective.

33

6.      **Section 18d-135 – Record Keeping**

Section 18d-135 requires towers to retain copies of disclosures and invoices for five years, and to make them available for inspection by the ICC.  Failure to produce records within three days of a request by the ICC can result in suspension and monetary fines of up to $1,000 for each violation. In other words, this Section tracks the record keeping requirements of Sections 18d-120(b) (as to disclosures) and 18d-125 (as to invoices), and imposes fines for violations of those requirements.  As discussed above, the itemized invoice requirement is preempted as a service not genuinely responsive to safety concerns while the disclosure requirements are outside the scope of federal preemption because they are genuinely responsive to the safety risks caused by wreck chasers.  Because subsection 18d-120(b) is not preempted, the mechanism for enforcing that requirement, if it is related to a service, also stands for the same reasons that the disclosure requirement itself is not preempted.

7.      **Section 18d-150 – Prohibition of Liability Limitation or Waiver**

Section 18d-150 prohibits a towing company from including in its contracts any provision that waives or limits the liability of the company, in tort, contract, or under any other cause of action that the vehicle owner or operator may have against the company.  The link between waiver or limitation on liability clauses and "prices" or "rates" has been recognized by Illinois courts. See, *e.g.*, *In re Ill. Bell Switching Station Litig.*, 161 Ill. 2d 233, 252 (1994) (Miller, J., specially concurring) ("The liability exclusion found in Illinois Bell's tariff plays an important part in keeping rates low; if Bell is to bear the risk of liability for damages of the type sought here, then it will have to charge all its customers higher rates for the services it

provides"). Because Section 18d-150 is related to a towing company's prices, it falls within the scope of federal preemption under Section 14501(c)(1).

Defendants have not suggested – nor can the Court envision – what safety concern is addressed by Section 18d-150. See [84 at 40-41]. Of all the provisions in the State Towing Law, Section 18d-150 appears to most directly advance the General Assembly's "consumer protection" goals, but without any readily discernible safety motive.

### 8.    Sections 18d-155 – Penalties

Section 18d-155 permits the Illinois Commerce Commission to "request documentation or investigate business practices by a commercial vehicle safety relocator to determine compliance with [the Towing Law]." If the Commission determines that a tower has not complied with the Towing Law, section 18d-155 allows it to suspend a tower's registration certificate or to impose fines of up to $1,000 for each violation. To the extent that a provision of the Towing Law is preempted, towers obviously cannot be penalized for noncompliance. But if a provision of the Towing Law is outside the scope of federal preemption, it can be enforced through section 18d-155. This section allows for relatively modest financial penalties and suspensions of registration certificates. Without these (or similar) penalties, towers would have little reason to comply with the substantive provisions of the Towing Law. Section 18d-155 is not preempted.

### 9.    Section 18d-160 – Illinois Consumer Fraud Act

Section 18d-160 makes noncompliance with sections 18d-115 (registration), 18d-120 (authorization, disclosure), 18d-125 (invoice), 18d-130 (signage at facility), or 18d-153

(misrepresentation of affiliation)[7] an unlawful practice within the meaning of the Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1, *et seq*. Defendant argues that the Towing Law's reference to the ICFA is not preempted for the same reason that the Towing Law's own penalty provisions are not preempted: without penalties, the Towing Law would be a dead letter. Defendant goes on to cite the Court's opinion from the preliminary injunction, which noted that the Court found Plaintiffs' challenge to 18d-155 "somewhat puzzling" because, to the extent that the underlying provisions are not preempted, they do not have any unlawful effect on the relationship between owners and operators. The Court did not see how Plaintiffs could obtain independent relief through a challenge to section 18d-155, and so denied preliminary injunctive relief as to that section. In its lead brief, Defendant attempts to extend this reasoning to 18d-160, asserting that "[t]he enforcement provisions are not subject to an independent challenge." [84 at 35].

But as Plaintiffs point out, there are grounds for an independent challenge to section 18d-160. In *Wolens*, the Supreme Court held that the ADA prohibited the plaintiffs from challenging an airline's retroactive changes to its frequent flyer program under Illinois' consumer fraud law, although the plaintiffs could challenge the airlines' retroactive changes as a breach of contract. 513 U.S. at 233. Thus, the Supreme Court distinguished between a fraud action, which *Wolens* characterized as a way for a state to "guide and police" the practices of airlines, and a contract action, which "simply holds parties to their agreements." *Id.* at 228-29. "This distinction between what the State dictates and what the airline itself undertakes confines courts, in breach

---

[7] "It shall be unlawful for any tower to misrepresent an affiliation with the State, a unit of local government, an insurance company, a private club, or any other entity for the purpose of securing a business transaction with a vehicle owner or operator." 625 ILCS 5/18d-153. Plaintiffs do not claim that section 18d-153 is preempted by federal law.

of contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 233.

Defendant does not mention *Wolens* in its discussions of section 18d-160. Resting on its reasoning for section 18d-155, Defendant's position is that if the substantive sections of the Towing Law are outside the scope of federal preemption, whether because a section does not fall under § 14501(c)(1) or because it is saved by the safety exception, then allowing a suit under ICFA a penalty violation of those sections cannot give rise to preemption problems. The Court is not persuaded. Section 18d-155 gives the Towing Law teeth. Under 18d-155, if a tower violates the Towing Law, the Illinois Commerce Commission is empowered to revoke its registration and fine it $1,000 for each violation. There is no record evidence (or argument) that section 18d-155 is insufficient as an enforcement mechanism.

Recall that the Towing Law has a dual purpose: preventing fraud and promoting safety. Given its dual purpose, the Court has been tasked with determining which provisions (if related to a service or price of a tower) are genuinely responsive to safety concerns and which aren't. Because towing law already has an enforcement mechanism that carries the severe penalty of suspension in addition to fines, the Court cannot avoid the conclusion that Towing Law's reference to the Illinois Consumer Fraud and Deceptive Business Practices Act is consumer-protection measure responsive to genuine concerns about wreck chasers, but not genuinely responsive to *safety* issues caused by wreck chasers. If, for example, the Illinois Commerce Commission can prohibit a tower from operating if it fails to properly register or make disclosures, then what safety rationale is there for allowing dissatisfied customers to bring fraud actions for the same failings? The Court sees none; the reference to ICFA appears to be pure consumer protection. Whether wise or not, as a consumer-protection measure related to a

property-transportation service of a motor carrier that is not genuinely responsive to safety concerns, it is preempted by federal law.

### 10.    Section 18d-165 – Payment by Cash or Credit Card

Section 18d-165 requires that "[a]ny towing or storage charges accrued by the vehicle owner or operator shall be payable by the use of any major credit card, in addition to being payable in cash." At the preliminary injunction stage, the Court concluded that requiring towing companies to accept any major credit card in addition to cash "require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer)" or "might prefer to discontinue in the future." *Rowe*, 522 U.S. at 372. Defendant now points the Court to *Independent Towers of Washington v. Washington*, 350 F.3d 925, 932 (9th Cir. 2003), which concluded that, in the context of *non-consensual* towing, a credit card requirement was not a service, and if it related to price, it was outside the scope of federal preemption under the non-consensual towing exception of § 14501(c)(2)(C). Unfortunately for Defendant, the Ninth Circuit did not explain why it determined that requiring towers to accept credit cards is not related to a property-transportation service of a motor carrier. Without any reasons, the bald assertion that requiring towers to accept a credit card is not related to a towing service is not persuasive, and all the more so, because, as explained above, the Ninth Circuit has a more restrictive definition of "services" than most of its sister circuits, including the Seventh Circuit. The Court therefore adheres to its prior conclusion that the method of payment for the transportation of property relates to the transportation of property. The requirement is specific and cannot be discharged easily, by putting up a sign, for example. The credit card requirement will therefore be preempted unless Defendants can demonstrate that the safety exception applies.

Defendant argues that the credit card requirement is genuinely responsive to safety concerns because it expedites the recovery of vehicles from tow lots and allows customers to do so without having to carry large sums of cash, which could be dangerous if the tow lot is in an out-of-the-way place. They claim that other courts have credited this argument, citing two cases from the California Court of Appeals: *Renne*, 86 Cal App. 4th at 1091 and *Berry v. Hannigan*, 7 Cal. App. 4th at 591. As discussed above, however, both of those cases deal with nonconsensual towing. The same rationale does not apply to consensual tows, where the customer, or a person with the customer's interests in mind, decides where to have the car towed. If the owner or operator is going to recover the car himself, it stands to reason that he will not have it towed to a place that he considers dangerous. Nonconsensual towing is a different story, and in such cases the necessity of a late-night visit to an undesirable or unfamiliar locale is more than a remote possibility. Defendant argues in its reply brief that "the line between consensual and non-consensual towing is blurred for wreck chasers who arrive unauthorized at the scene of an accident and tow to an undisclosed location." [98 at 27]. But under a different section of the Towing Law, the destination of the tow must be disclosed. So Defendant's imagined auto theft would not only be a crime, but also a violation of the Towing Law. In short, the safety rationale for requiring that companies providing consensual tows accept payment "by the use of any major credit card, in addition * * * [to] cash" is speculative and improbable. Section 18d-165 is therefore related to a property-transportation service of a motor carrier but not genuinely responsive to safety concerns and, as such, it is preempted by federal law.

### C.     Severability of the Preempted Sections

Illinois law provides that if a provision of an "Act" is held invalid, "such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid application or provision," and "to this end the provisions of each Act * * * are severable, unless provided otherwise by the act."  5 ILCS 70/1.31; *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 804 (7th Cir. 1999) (Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law.").  Moreover, under Illinois law, there is an "obligation to uphold legislative enactments wherever reasonably possible," and thus may "excise the offending portion" of an Act and "preserve the remainder," provided that "the remainder is complete in and of itself, and is capable of being executed wholly independently of the severed portion."  *People v. Sanders*, 696 N.E.2d 1144, 1149 (Ill. 1998).

In this case, the Court is confident that the non-preempted remainder of the Towing Law is "complete in and of itself."  The Court's confidence is not based on conjecture but on the record in this case.  Soon after the Towing Law went into effect, the Court enjoined several sections of the law.  Those sections of the law remained out-of-force during discovery.  The parties therefore were able to document the efficacy of the law even without certain offending provisions.  After considering the law on a more complete record, the Court is now enjoins a slightly different set of provisions than it did in at the preliminary injunction stage, but the resulting law remains "complete," as a strong response to wreck chasing, even if not to every conceivable consumer disturbance that wreck chasers may cause.

**IV.      Conclusion**

For the reasons stated above, the Court concludes that Towing Law sections 18d-120(a), 18d-125, 18d-150, and 18d-165 are preempted by federal law.  Those sections are enjoined.  The remainder of the Towing Law is capable of being executed independently, and so the Towing Law is not preempted in its entirety.   Accordingly, the parties' cross-motions for summary judgment [100, 101] are granted in part and denied in part.


Dated: August 16, 2013                                 _____
                                                                 Robert M. Dow, Jr.
                                                                 United States District Judge